# **EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IN RE SEARCH WARRANT

Case No.: 23-SW-392-LDA

## MOTION TO SEAL

The United States of America, by and through its attorneys, Zachary A. Cunha,

United States Attorney, and Peter Roklan, Assistant United States Attorney, moves that

this Motion to Seal and the attached Application for Search Warrant, Supporting

Affidavit, and Search Warrant be sealed until further Order of this Court.

Respectfully submitted,

UNITED STATES OF AMERICA
By its attorneys,

ZACHARY A. CUNHA
United States Attorney

PETER ROKLAN
Assistant U.S. Attorney
U.S. Attorney's Office
One Financial Plaza, 17th Fl
Providence, RI 02903
Tel (401) 709-5000
Fax (401) 709-5001

SO ORDERED:

LINCOLN D. ALMOND
UNITED STATES MAGISTRATE JUDGE
DATE: 12/6/23

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### District of Rhode Island

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* **The premises located at 8 Thomas Avenue, Apartment 1, Pawtucket, Rhode Island, and further described below.** | ) ) ) ) ) ) Case No. 23-SW-391 LDA |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-9.

located in the _____ District of _____ Rhode Island _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-9.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Distribution of controlled substances and conspiracy to distribute controlled substances. |

The application is based on these facts:

Please see the attached affidavit of Special Agent J. Carlos Razon with the Federal Bureau of Investigation ("FBI")

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

J. Carlos Razon, Special Agent ~ FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 12/6/23

_____
*Judge's signature*

City and state:  Providence, Rhode Island

Lincoln D. Almond, US Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original        ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Rhode Island

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| The premises located at | )  Case No.  23-SW-392DA |
| 8 Thomas Avenue, Apartment 1, | ) |
| Pawtucket, Rhode Island, and further described below. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Rhode Island_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A-9.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-9.

**YOU ARE COMMANDED** to execute this warrant on or before _____December 20, 2023_____   *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Lincoln D. Almond_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  12/6/23   2:30pm

City and state:   Providence, Rhode Island

*Judge's signature*

Lincoln D. Almond, US Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>23-SW-    LDA | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |

Inventory of the property taken and name(s) of any person(s) seized:

| **Certification** | |
|---|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*


_____
*Printed name and title*

## ATTACHMENT A-9

### Premises to be Searched

**CALVIN TAVAREZ's** ("TAVAREZ") residence at 8 Thomas Avenue, Apartment 1, first floor, Pawtucket, Rhode Island ("TARGET PREMISES 7"). Described as a multi-family building on a dead-end street. The exterior of the residence is painted brown with white accents and the foundation is painted red. There is a driveway to the right side of the building. There are 3 doors on the building, the front door, right side door, and rear door. The right-side door has 5 stairs from the driveway which has two mailboxes on either side of it. To the left of the white door, the mailbox has a number "1" and to the left of the door, the mailbox has the number "2." The front door has 5 stairs that lead to the white door with no markings indicating the building number. The rear door has no steps and appears to be access to the basement, from a shared backyard between units 1 and 2. Access into Apartment 1 is made through the front door facing the street.



## ATTACHMENT B-9

### Particular Things to be Seized (TARGET PREMISES 7)

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to CALVIN TAVAREZ and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks, bank

drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

    f)  Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

    g)  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

    h)  TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of CALVIN TAVAREZ; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to CALVIN TAVAREZ

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to TARGET PREMISES 7 described in Attachment A-9.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii. Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

    g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## AFFIDAVIT

I, Juan Carlos Razon, being first duly Sworn, hereby depose and state as follows:

## INTRODUCTION

1.      This affidavit is also made in support of an Application for a Search Warrant for

the following persons and properties- including their common areas, and appurtenances:

    a.  **MARC DURE's** ("DURE") residence at 18 Tecumseh Street, Apartment 4, Providence, Rhode Island ("TARGET PREMISES 1"), and further described in Attachment A-1, for the items described in Attachment B-1.

    b.  **MARC DURE's** white Hyundai Sonata ("TARGET VEHICLE 1"), Rhode Island registration 1IW608, and further described in Attachment A-2, for the items described in Attachment B-2.

    c.  **MARC DURE's** mailing address at 35 East Drive, Apartment 2B, Providence, Rhode Island ("TARGET PREMISES 2"), and further described in Attachment A-3, for the items described in Attachment B-3.

    d.  **MARC DURE's** secondary address at 12 Rankin Avenue, Providence, Rhode Island ("TARGET PREMISES 3"), and further described in Attachment A-4, for the items described in Attachment B-4.

    e.  **COTY ELDRED's** ("ELDRED") residence at 1119 Douglas Avenue, Apartment 15, North Providence, Rhode Island ("TARGET PREMISES 4"), and further described in Attachment A-5, for the items described in Attachment B-5.

    f.  **COTY ELDRED's** garage at 143 Mineral Spring Avenue, Garage / Basement, Pawtucket, Rhode Island ("TARGET PREMISES 5"), and further described in Attachment A-6, for the items described in Attachment B-6.

    g.  **JOHN DAILEY's** ("DAILEY") residence at 86 Edgemere Avenue, Apartment 1, Providence, Rhode Island ("TARGET PREMISES 6"), and further described in Attachment A-7, for the items described in Attachment B-7. *First Floor Only*

h. **JOHN DAILEY's** vehicle, a white Dodge Durango ("TARGET VEHICLE 2"),
New York registration KBR3916, and further described in Attachment A-8, for the
items described in Attachment B-8.

i. **CALVIN TAVAREZ's** ("TAVAREZ") residence at 8 Thomas Avenue,
Apartment 1, Pawtucket, Rhode Island ("TARGET PREMISES 7"), and further
described in Attachment A-9, for the items described in Attachment B-9.

j. **PEDRO FABERLLE's** ("FABERLLE" or TARGET PERSON 1)", and further
described in Attachment A-10, for the items described in Attachment B-10.

k. **CHARLES LASSITER's** ("LASSITER") residence at 685 Charles Street,
Apartment 1, Providence, Rhode Island ("TARGET PREMISES 8"), and further
described in Attachment A-11, for the items described in Attachment B-11.

l. **ROBERT HOGAN's** ("HOGAN" or "TARGET PERSON 2") person, year of
birth (YOB): 1982, and further described in Attachment A-12, for the items
described in Attachment B-12.

m. **ROBERT HOGAN's** residence at 26 Becker Street, Johnston, Rhode Island
("TARGET PREMISES 9"), and further described in Attachment A-13, for the
items described in Attachment B-13.

n. **ROBERT HOGAN's** vehicle, a 2019 black Chevy Truck ("TARGET VEHICLE
3") bearing the Rhode Island registration: 1FK712, and further described in
Attachment A-14, for the items described in Attachment B-14.

o. **CARLOS RODRIGUEZ's** ("RODRIGUEZ") residence at 298 Pawtucket
Avenue, Apartment 6, Pawtucket, Rhode Island ("TARGET PREMISES 10"), and
further described in Attachment A-15, for the items described in Attachment B-15.

I also submit this affidavit in support of an arrest warrant for RODRIGUEZ, who is known to reside at TARGET PREMISES 10 and is further described in Attachment A-15.

## AGENT BACKGROUND, TRAINING, & EXPERIENCE

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") United States Department of Justice and have been employed in that capacity since March 2020. I am currently assigned to the Rhode Island Safe Streets Gang Task Force (hereinafter, the "Task Force") and investigate violent street gangs and drug/firearms trafficking organizations operating in and around the State of Rhode Island. Prior to my employment with the FBI, I served in the United States Navy from 2011-2016 and I worked as a Law Enforcement Officer in the City of Norfolk, Virginia from 2016-2020, where I worked in a capacity as a uniformed patrol officer and a Detective investigating violent street crimes in and around the city of Norfolk.

3.      I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41 (a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

4.      I have received training in the field of narcotics and firearms enforcement and investigations. I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal firearms and drugs. I have been the affiant on dozens of affidavits in support of search warrants, arrest warrants, Title III Wiretaps, GPS location warrants and other applications. Through my training, education and experience, I have become familiar with the manner in which illegal narcotics and firearms are transported, stored, and distributed, and with the methods of payments for such items.

5.    Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs/firearms and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug and gun transactions; and use cellular telephones to facilitate their illegal distribution operations. I also know that drug/weapons trafficking is an illicit business and an ongoing process requiring the development, use, and protection of a communication network to facilitate daily drug distribution. Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and uses coded communications. Based on my experience in drug and firearm investigations, I know that traffickers frequently refer to illicit drugs and guns in guarded conversations and frequently use code words when referring to controlled substances or money.

6.    Based upon my training and experience and my participation in this investigation, I know that:

a.    Drug traffickers often places assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually know or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

b.    Person involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug

transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending money made from engaging in narcotic trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

        c.    Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

        d.    Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, cellular telephones and other electronic data storage devices, and other information that reveals the names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code. Records and electronic devices of this sort are frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

        e.    Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property. Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of drug traffickers, and provide valuable evidence of the conspiratorial relationships. Records of this type are sometimes in hard copy, but are increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

f.    Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses, or other locations controlled by them. That drug paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers, which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug detection dogs. Large-scale drug traffickers sometimes use money counting machines to help count and sort the proceeds of drug trafficking.

g.    Drug traffickers commonly consign controlled substances and weapons to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in location where traffickers have ready access to them, including on their person or in their residences, vehicles, businesses, stash houses, and smart telephones, tablets, and personal computers. Drug and gun traffickers also normally maintain these items and records for long periods of times, regardless of whether their value to the dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

h.    Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence that list their names and addresses in that residence. Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage documents, clothing, and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence are found. Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that stores data electronically.

7.    I also know that individuals who possess firearms will often keep them in their vehicles and in their homes.  I know that firearms, unlike drugs are often kept for lengthy periods of time, months and years, and are often more difficult to acquire and aree generally kept longer than narcotics.

<u>BACKGROUND, METHODS & MEANS</u>

8.    This investigation was initiated by the FBI Rhode Island Safe Streets Gang Task Force ("the SSGTF"). This affidavit is based on my own investigation and on information reliably provided to me by other federal, state, and local law enforcement agents in Rhode Island. I have relied on information supplied by Agents, Troopers, Detectives, and Officers from the FBI, Drug Enforcement Agency ("DEA"), United States Postal Inspector Service ("USPIS"), Rhode Island State Police, Providence Police Department, Woonsocket Police Department, Central Falls Police Department, West Warwick Police Department, Cranston Police Department, Pawtucket Police Department, and the United States Marshal's Office. I have also relied on reports of investigations that I have prepared or that were prepared by other law

enforcement agents; business records, and public and/or law enforcement databases. I have also

relied on information provided to me and to other law enforcement agents by a Cooperating

Witness who I will refer to only as "CW-1."

9.     The facts set forth in this affidavit are based upon my personal observations, my

training and experience, and information obtained from various law enforcement personnel and

witnesses. This affidavit is intended to show that there is sufficient probable cause for the

requested warrants and does not purport to set forth all of my knowledge of the investigation into

this matter. Unless specifically indicated otherwise, all conversations and statements described

in this affidavit are related in substance and in relevant part only.

*Cooperating Witness #1*

10.     A Cooperating Witness (hereinafter, "CW-1") has been providing the FBI with

information regarding ELDRED since approximately April 2023. CW-1 has been compensated

with monetary payments for his cooperation in this investigation thus far and will continue to be

paid for his cooperation in this investigation.  CW-1 has a criminal history that includes, theft,

breaking and entering, possession of stolen goods, obstruction, narcotics violations, traffic

violations, possession of a weapon, and domestic violence offenses.   CW-1 has served jail time

for breaking and entering, domestic violence, theft, and driving offenses and has been found to

be in violation probation.  CW-1 is currently on bail for a pending felony offense.  He was

recently investigated by law enforcement for theft and was found to be in possession of narcotics

and agreed to cooperate with law enforcement.  CW-1 was not charged with the possession or

theft offense.   Since the start of his cooperation, CW-1 has provided me with information that I

or other law enforcement agents have independently corroborated through toll records, physical surveillance and other law enforcement confidential sources. CW-1 is willing to testify in this investigation and has communicated with ELDRED by phone calls and text messages in the presence of law enforcement. On each occasion, CW-1 communications with ELDRED were monitored and recorded by myself or another member of law enforcement. CW-1 has participated in controlled purchases of narcotics from ELDRED that were monitored and recorded. CW-1 knows ELDRED as a person from whom he can purchase fentanyl pills. Prior to the start of the investigation, CW-1 showed members of law enforcement photos of ELDRED, whom the CW-1 knows as "Coty," and identified him as a supplier of fentanyl pills. In order to protect CW-1's identity, I will refer to CW-1 with a masculine pronoun regardless of CW-1's gender.

*Confidential Source #1*

11.    A Confidential Source (hereinafter, "CS-1") provided the government information regarding ELDRED in November 2023. CS-1 was arrested in November 2023 and provided the information during a post-arrest interview. CS-1 has a criminal history that includes, possession of stolen vehicle parts, bank fraud and forgery, felony assault with a dangerous weapon, weapons violations, traffic violations, possession of a weapon, violation of no contact order, and domestic violence offenses. CS-1 has served jail time for domestic violence, weapons violations, felony assault with a weapon, and has been found to be in violation probation. CS-1 is currently incarcerated for a violation of a no contact order. During CS-1's arrest he asked to speak with law enforcement and was consensually interviewed by law enforcement for the purpose of leniency and assistance with his ongoing violation of no contact order. The information provided by CS-1 during the interview is information that I or other law enforcement agents have

independently corroborated through toll records, physical surveillance and other law enforcement confidential sources. CS-1 is not willing to testify in this investigation and has been intercepted on the ongoing Title III investigation where he has communicating with ELDRED by phone. CS-1 knows ELDRED as COTY and knows him to be a marijuana and crack-cocaine dealer. I will refer to CS-1 in masculine pronouns, regardless of CW-1's gender.

*Controlled Purchases*

12.     Over the course of this investigation, CW-1 has participated in 12 controlled purchases of narcotics from ELDRED. In each case, CW-1 arranged the drug deal by contacting ELDRED at the either the Dropped Phone 1 ("DP1"), Dropped Phone 2 ("DP2"), or 401-212-3997 ("TARGET TELEPHONE #1 or TT1"). On each occasion, the contact was by text messages, phone calls, or both, and a quantity of narcotics was ordered. The calls made by CW-1 were recorded and conducted in the presence of myself or another participating law enforcement officer. The text messages sent and received by CW-1 were photographed by me or another participating law enforcement officer. On each occasion, law enforcement investigators checked CW-1 for contraband prior to the transaction to be sure that he was not already in possession of any narcotics, and that he did not have any additional cash on his person. CW-1 was then supplied with only enough official government funds for the purchase of the amount of narcotics that had been ordered. In addition, CW-1 was equipped with an audio and video recorder for all controlled buys in which he participated. CW-1 was followed to the transaction sites, and surveillance was maintained near those locations. Following each transaction, CW-1 was followed to a predetermined meeting location where he turned over the narcotic evidence to me or another law enforcement officer working on this investigation. In each case, CW-1 was debriefed, and the audio and video recording devices were retrieved and reviewed. Additionally,

a field test was performed on all of the drugs that had been purchased. In every instance, the field tests returned a positive indication for the presumptive presence of the drug that was purchased.[1] Whenever I use the term "controlled purchase" in this affidavit, this is the procedure that we followed.

13.     After each controlled purchase, the drugs were secured as evidence and have been submitted to the DEA Northeast Laboratory.

| Date | Order or payment arranged through: | Drug | Amount of pills: | Gross Weight (g): | Amount Paid: | Delivered by: | Location of Delivery: | Phones Used: |
|---|---|---|---|---|---|---|---|---|
| 4/10/2023 | Coty Eldred | Fentanyl Pills | 50 | 6.3 | $400 | Coty Eldred | 673 Smith St., Providence, RI | DP1 |
| 4/18/2023 | Coty Eldred | Fentanyl Pills | 500 | 74.4 | $3,000 | Coty Eldred | 60 Joseph St., Providence, RI | DP1 |
| 4/25/2023 | Coty Eldred | Fentanyl Pills | 500 | 52.4 | $2,840 | Coty Eldred / Marc Dure | 60 Joseph St., Providence, RI / 200 Whittier Ave., Providence, RI | DP1/TT2 |
| 5/22/2023 | Coty Eldred | Fentanyl Pills | 200 | 24.6 | $1,150 | Coty Eldred / Marc Dure | 987 Chalkstone Ave., Providence, RI | DP1/TT2 |
| 6/7/2023 | Coty Eldred | Fentanyl Pills | 1000 | 168.1 | $4,000 | Coty Eldred / John Dailey | Vincent Avenue, Pawtucket, RI | DP1/DP2/ (401) 359-4736 |

---

[1] The suspected fentanyl from each of these transactions has been submitted to the Rhode Island State Laboratory and/or the Drug Enforcement Administration Northeast Laboratory for further testing. To date, results have been received for three of the controlled purchases (4/10/2023, 4/25/2023, and 10/23/2023). All of the results returned with a positive result for the presence of fentanyl.

| 6/21/2023 | Coty Eldred | Fentanyl Pills | 1000 | 170.1 | $4,000 | Coty Eldred / John Dailey | 151 Douglas Pike, Smithfield, RI | DP2 / (401) 359-4736 |
|---|---|---|---|---|---|---|---|---|
| 7/12/2023 | Coty Eldred | Fentanyl Pills | 1000 | 121.9 | $4,250 | Coty Eldred / Marc Dure | Texas Avenue, Providence, RI | DP2/TT2 |
| 8/16/2023 | Coty Eldred | Cocaine | N/A | 29.0 | $740 | Coty Eldred | Samoset Avenue, Providence, RI | DP2 |
| 8/25/2023 | Coty Eldred | Fentanyl Pills | 1000 | 129.0 | $4,250 | Coty Eldred / Marc Dure | 614 Pawtucket Avenue, Providence, RI | TT1 / TT2 |
| 10/23/2023 | Coty Eldred | Fentanyl Pills | 1000 | 99.2 | $4,250 | Coty Eldred / Pedro Faberlle | 672 Plainfield Street, Providence RI | TT1 / (774) 415-3546 |
| 10/31/2023 | Coty Eldred | Fentanyl Pills | 1000 | 147.65 | $4,250 | Coty Eldred/ Carlos Rodriguez | 216 Broadway Pawtucket, RI | TT1 / (401) 499-4334 |
| 10/31/2023 | MARC DURE | Half / Half | N/A | N/A | N/A | Charles Lassiter to Mark Kelley | 560 Mineral Spring Avenue, Pawtucket, Rhode Island | TT2 / (401) 390-4097 / (401) 309-3858 |
| 11/2/2023 | Marc Dure | Fentanyl | N/A | 30 | N/A | Calvin Tavarez | Rankin Avenue, Providence, RI | TT2 / (401) 919-9941 |
| 11/2/2023 | Marc Dure | Cocaine | N/A | 100 | N/A | Calvin Tavarez | Rankin Avenue, Providence, RI | TT2 / (401) 919-9941 |
| 11/12/2023 | Marc Dure | Fentanyl Pills | 1500 | N/A | $2,625 | John Dailey | 85 Power Road, Pawtucket, RI | TT2 / (401) 548-4736 |
| 11/27/2023 | Coty Eldred | Fentanyl Pills | 500 | 69.5 | $2,260 | Coty Eldred/ | Fisk Street, Providence, RI | TT1 / (401) 499-4334 |

| | | | | | Carlos Rodriguez | | |
|---|---|---|---|---|---|---|---|

14.     ELDRED, DURE, and their co-conspirators have been under investigation for narcotics trafficking since April 2023. CW-1 working with the FBI has made purchases of narcotics on multiple occasions from ELDRED. DURE is believed to have supplied ELDRED on at least four occasions, DAILEY is believed to have supplied ELDRED on at least two occasions, FABERLLE is believed to have supplied ELDRED on at least one occasion, and RODRIGUEZ is believed to have supplied ELDRED on at least two occasions. On October 6, 2023, The Honorable Chief Judge John J. McConnell, Jr. authorized the authority to Intercept Wire and Electronic Communications from (401) 212-3997 (the "TARGET TELEPHONE 1 or TT1") a phone identified to be used by ELDRED. On October 11, 2023, The Honorable Chief Judge John J. McConnell, Jr. authorized the authority to Intercept Wire and Electronic Communications from (401) 359-4037 (the "TARGET TELEPHONE 2 or TT2") a phone identified to be used by DURE (23-WT-001-JJM). On November 8, 2023, The Honorable Chief Judge John J. McConnell, Jr. authorized the authority to Continue to Intercept Wire and Electronic Communications from TT1 and TT2.

15.     I believe that the monitored telephone calls and text messages show that ELDRED, DURE, DAILEY, FABERLLE, TAVAREZ, LASSITER and others known and unknown have committed the offenses: of Distribution of Controlled Substances, and Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances ("TARGET OFFENSES").

16.     On Wednesday November 29, 2023, a Federal Grand Jury returned a True Bill for the indictment of ELDRED, DURE, DAILEY, FABERLLE, TAVAREZ, and LASSITER,

charging ELDRED, DURE, DAILEY, and FABERLLE with distribution of fentanyl (and

ELDRED with an additional count of distribution of cocaine), and returned an indictment against

ELDRED, DURE, DAILEY, FABERLLE, TAVAREZ, and LASSITER with conspiracy to

distribute and possess with the intent to distribute fentanyl.

<u>SUMMARY OF PROBABLE CAUSE TO SEARCH</u>

**18 Tecumseh Street, Apartment 4, Providence, Rhode Island (TARGET PREMISES 1)**

**5  East Drive, Apartment 2B, Providence, Rhode Island (TARGET PREMISES 2)**

17.    Members of law enforcement conducted multiple checks regarding the TARGET

PREMISES 1 and TARGET PREMISES 2, and discovered the following:

a.    TARGET PREMISES 1, is a multi-family dwelling which contains four listed

apartments.  It has been identified as the primary residence of DURE, through

surveillance, subpoenas, and intercepted call information. Additionally, a pole

camera has been affixed and observing the TARGET PREMISES 1 since the start

of this investigation, reviewed footage of the pole camera on TARGET

PREMISES 1 shows that DURE is observed overnight at the TARGET

PREMISES 1. The electrical utilities are currently being paid for by GENISES

DIAZ, DURE's girlfriend. USPIS has also provided that DIAZ, receives mail at

the TARGET PREMISES 1, indicating the shared space is occupied by DURE as

well. Additionally, a subpoena served to COX revealed that DURE pays for the

COX internet at the TARGET PREMISES 1 identifying this address as his

primary residence.

b.    TARGET PREMISES 2 has been identified as the mailing address for DURE, as

per the USPIS, he receives his mail at TARGET PREMISES 2. A subpoena

served for the utilities of the TARGET PREMISES 2 shows that the person

responsible for paying the bill is named Brendan Jolcimat and provided the phone

number (401) 497-8553. Although that name is provided, members of law

enforcement have confirmed that the user of the 8553 number is RHONDA

REED, DURE's mother.

18.     On October 19, 2023, at approximately 7:54 PM, DURE received an incoming

call from (401) 612-8521 (Session 3473) to TT2. This number has been identified to be used by

Brian BEAGAN ("BEAGAN"). During the call BEAGAN asked DURE if he was around, to

which DURE responded and told BEAGAN to meet at the same spot as yesterday. Members of

law enforcement know, through surveillance and the interception of text messages from TT2 to

the 8521 number, that DURE conducted a narcotic transaction with BEAGAN in the vicinity of

Texas Avenue in Providence, Rhode Island on October 18, 2023. Surveillance was initiated at

this location, and members of law enforcement observed a vehicle registered to BEAGAN arrive

in the area of Texas Avenue and at the TARGET PREMISES 2, where DURE was at the time of

the call from BEAGAN.

19.     As DURE left the TARGET PREMISES 2 at approximately 8:13 PM, DURE had

a call with (401) 390-4097 (Session 3488). This number is known to be utilized by LASSITER.

Surveillance units also simultaneously observed DURE meet with BEAGAN and conduct a

hand-to-hand transaction.  During the conversation between LASSITER and DURE, DURE is

overheard conducting the controlled purchase with BEAGAN in the background of the call at

8:16 PM, where members of law enforcement can hear BEAGAN stating, "something is wrong

with my phone bro, I'm not getting messages [unintelligible] you" and DURE overheard saying

"here." Based on my knowledge of the investigation and previously overhearing conversations

with BEAGAN on the 8521 number, I believe BEAGAN was approaching DURE's vehicle

explaining that he was having issues with his phone and DURE stating "here" to mean he is

giving him something.  As the call continued, DURE and LASSITER continued talking while

DURE was driving, and 8:17 PM, DURE tells LASSITER, "I'm going to Jail Bro". While

LASSITER asks DURE what is going on, DURE appears to be talking to another person.

Members of law enforcement were on surveillance and observed DURE being pulled over by a

Providence Police Officer and observed DURE talking to the Police Officer at the time he was

on the phone with LASSITER and that call was being monitored. The Officer is overheard

telling DURE that he was pulled over for running the stop sign and DURE told the Officer that

he is going to call his mom.

20.    At approximately 8:18 PM, DURE made an outgoing call to (401) 497-8553

(Session 3489). This phone has been identified to belong to Rhonda REED ("REED"), DURE's

mother. During the call the following conversation occurs:

**DURE**: *... Have all the shit on me*

**REED**: *Well, that's making me nervous*

**DURE**: *He's talking about complaints of the ...*

**REED**: *What is it, a Statie?*

**DURE**: *Some weird ass. I was about to dip on him.*

**REED**: *Is it a Statie?*

**DURE**: *Something like that.*

**REED**: *Where are you?*

**DURE**: *Right here on the street.*

**REED**: *I don't even know what to do.*

**DURE**: *Yeah, you might have to come around the corner, hurry up, please ma.*

**REED**: *Where?*

**DURE**: *I got mad shit on me!*

**REED**: *Where?*

**DURE**: *He usually though, this nigga is good. I should of, damn man. I should have threw this shit. Fucking damn man, fuck.*

**REED**: *I don't even know where you are Marc.*

**DURE**: *Ma, I am right around the corner, right on Sharon.*

**REED**: *Sharon? I don't want to drive over there though!*

**DURE**: *Ma hurry the fuck up to throw him off!*

**REED**: *Im putting my shoes on now bye.*

     21.    Based on this call, SA Razon believes that DURE had a lot of narcotics on his person and was trying to get his mother, REED, to distract the officer so that DURE could either run away, get rid of the narcotics, or lead law enforcement on a pursuit. SA Razon also believes that based on this conversation between DURE and his mother that she knows about DURE's narcotic dealings.

     22.    REED has an address of the TARGET PREMISES 2. She has been attributed to this phone and DURE has been observed at her residence, on multiple occasions. Just prior to the narcotic transaction with BEAGAN, DURE was at REED's residence, he was surveilled from TARGET PREMISES 2, to the area of Texas Avenue, where he met with BEAGAN.

     23.    On November 24, 2023, at 9:19 PM, DURE received an incoming call from (508) 496-8766 to TT2 (Session 12806). This number has been identified to belong to LEIGH WINDLE. During the call the following conversation occurred related to drug trafficking:

**DURE**: *Yes yo*

**WINDLE**: *Oh my gosh that was so loud. Hey what's up um I'm in Seekonk right now so can I?*

**DURE**: *Alright yeah head out.*

**WINDLE**: *Alright.*

**DURE**: *What you want?*

**WINDLE**: *Um 3 down and 44 up*

**DURE**: *Alright*

**WINDLE**: *Alright*

     24.    I have recently learned that "down" is a slang term for fentanyl and "up" is a slang term for crack cocaine. Based on this information, I believe that WINDLE was ordering 3 grams of fentanyl and 44 grams of crack cocaine.

     25.    At approximately 9:21 PM, I monitored the video feed from a pole camera which had been placed in the area of TARGET PREMISES 1 and observed DURE arrive at TARGET PREMISES 1.

     26.    At approximately 9:33 PM, the video feed from the police camera showed DURE exit TARGET PREMISES 1 and enter a green Tacoma. Surveillance units who arrived in the area in anticipation of the narcotics transaction began following DURE. DURE drove from TARGET PREMISES 1 to TARGET PREMISES 2, where he arrived at 9:43 PM. DURE momentarily stopped at the TARGET PREMISES 2 and then left at 9:44 PM.

     27.    At approximately 9:46 PM, DURE was surveilled from TARGET PREMISES 2 to 119 Funston Street, Providence, Rhode Island where he was observed by a member of law enforcement meeting with an unknown female at the passenger side of his green Tacoma. The member of law enforcement observed the female exit DURE's vehicle and return to the

passenger side of her vehicle, which was a Pontiac Sedan bearing the Massachusetts registration 3MAW83[2].

28.     At approximately 9:51 PM, the Pontiac was surveilled out of the area where it was pulled over at my direction by a marked Providence Police cruiser at the Branch Avenue shopping plaza located at 650 Branch Avenue, Providence, Rhode Island.

29.     During the traffic stop, the member of law enforcement identified the driver to be JENAI BADILLO-ISIDOR, DOB: 4/29/1996, with an address of 341 South Beacon Street, Fall River, Massachusetts, and the passenger to being LEIGH WINDLE, DOB: 11/16/1981, with an address of 85 Hailes Hill Road, Swansea, Massachusetts.

30.     The member of law enforcement separated both females and spoke to BADILLO-ISIDOR first. When speaking to BADILLO-ISIDOR, she admitted to having a scale in the center console of the vehicle but did not have any narcotics on her person. The member of law enforcement then seized the scale and discovered it had white powder residue all over the scale. BADILLO-ISADOR admitted to having met with a light skin black male who was driving a dark pickup truck to pick up narcotics. BADILLO-ISIDOR stated that the passenger of the vehicle, WINDLE is the one who met with him to purchase the narcotics.

31.     The member of law enforcement then began to speak with WINDLE who stated that she purchased both "up" and "down" from a light skin black male who she knows as "Smiley." WINDLE stated that down was a common street term for fentanyl and up is a common street term for crack cocaine. WINDLE then reached into her right sock and removed a clear plastic baggie which contained several small rock-like objects, consistent with the look, feel, and consistency of crack cocaine. Additionally, she removed a second baggie which contained a

---

[2] An NCIC database check was conducted on the vehicle that was stopped with Massachusetts registration: 3MAW89 shows the vehicle to be registered to BADILLO-ISIDOR for a 2005 blue Pontiac G6.

powdery substance, which had the look, feel, and consistency of fentanyl. WINDLE confirmed that both items were fentanyl and crack cocaine. WINDLE stated that there was initially more crack cocaine but when she saw the law enforcement vehicle behind her, she quickly opened the baggie and some of the narcotics were lost in the vehicle. WINDLE provided that she usually contacts "Smiley" on Facebook Messenger or WhatsApp and provided a cellular telephone number for him to be (774) 503-6169.[3] Based on this information, I believe that DURE, in addition to using TT2, uses at least one other telephone and a communications application to communicate with others to engage in narcotics trafficking .

32.    The member of law enforcement seized the narcotics and scale with suspected drug residue and advised both WINDLE and BADILLO-ISIDOR that charges would be pending based on laboratory results of the narcotics. Additionally, the member of law enforcement confirmed that the 8766 number did in fact belong to WINDLE and was her cellular telephone number.

33.    I received the narcotics from the member of law enforcement at approximately 11:15 PM. At which point I weighed the suspected fentanyl which had a gross weight of approximately 3.35 grams a yielded a positive result on a field test for the presence of fentanyl. I weighed the suspected baggie containing the alleged crack cocaine which weighed approximately .80 grams and field tested positive for the presence of a cocaine base.

34.    I also believe that TARGET PREMISES 1 is used to store drugs and drug proceeds.  On November 12, 2023, as detailed below, it is believed that DURE arranged to purchase 1500 counterfeit pills containing fentanyl from DAILEY for $2,625.  DURE left TARGET PREMISES 1 and drove to the meet location and from the meet location back to

---

[3] The provider for the phone is T-Mobile and the subpoena results for the subscriber information is still pending.

TARGET PREMISES 1. Based on the information contained in these paragraphs, I believe that DURE had the money for the drug transaction at TARGET PREMISES 1, purchased counterfeit pills containing fentanyl and returned with the pills directly to TARGET PREMISES 1.

### 12 Rankin Avenue, Providence, Rhode Island (TARGET PREMISES 3)

35.    TARGET PREMISES 3, has been referenced by DURE as a stash house, and during the course of this investigation, DURE has sold narcotics and been supplied narcotics multiple times, to include during one controlled purchase with the CW-1 on May 22, 2023. A subpoena for the utilities of the TARGET PREMISES 3 shows that Joseph Dure and Rita Dure, are the customers who pay for utilities at TARGET PREMISES 3.

36.    On Sunday October 22, 2023, at approximately 4:30 PM, DURE placed an outgoing call to (401) 332-9739 (Session 4039). The user of this number has still not been identified as will be referred to hereinafter as UM9739. During the call the following conversation occurred:

**DURE**: *Ya bro, this has nothing to do with you meeting me bro. None of that. I'm waiting for these fucking people to get the fuck away from my stash spot bro.*

**UM9739**: *Alright well just…*

**DURE**: *Cant just walk into my stashy and grab this shit bro, Ill be fucking…*

*[Overlapping voices]*

**DURE**: *If anything, ya you can though. Ill tell you when Im fucking… These niggas should be gone. Im going back over there right now.*

**UM9739**: *Alright*

**DURE**: *I'm trying to give these bitch ass niggas some time… Hello?*

**UM9739**: *Yo*

**DURE**: *Ya, I'm going over there right now to check my shit to see if they fucking moved*

**UM9739**: *Alright.*

**DURE**: *So, Ill call you right back in like 10 minutes*

**UM9739**: *Alright*

**DURE**: *Alright*

    37.    Based on this call, I believe that DURE is telling the UM9739 that he cannot meet with him until he goes to his stash spot and gets more of his narcotics. DURE was surveilled following his GPS ping on his cellular device which put him travelling in the vicinity of Providence College. Members of surveillance drove through known addresses for DURE and located his vehicle parked across the street from the TARGET PREMISES 3. I observed DURE as he exited from TARGET PREMISES 3 and entered his vehicle.

    38.    At approximately 4:56 PM, DURE placed an outgoing call to the UM9739 (Session 4046). During the call DURE instructed him to go to Chalkstone. DURE was observed parked behind 987 Chalkstone Avenue, Providence, Rhode Island, which is directly across the street from TARGET PREMISES 3. Shortly thereafter a gold Honda Accord bearing New Jersey license plate KB-651W was observed parking next to DURE and DURE was observed getting out of his vehicle and entering the passenger side of the vehicle.

    39.    At approximately 5:16 PM, after the meeting had ended, DURE made an outgoing call to UM9739 (Session 4052) and stating the following:

**UM9739**: *Yo*

**DURE**: *Cuz that shit. I grab a lot, don't get me wrong bro. But just, Ima have it always bro. Trust me.*

**UM9739**: *Alright bet bet*

**DURE**: *Alright*

**UM9739**: *Alright good looks.*

40.     I believe that after DURE met with the UM9739 he realized he did not have enough narcotics to supply him. DURE then called the UM9739 to apologize to him for not having enough and implied that he will always have it on him for next time the UM9739 calls again.

41.     On November 28, 2023, between 1:39 PM and 2:01 PM, DURE exchanged the following text messages with (401) 516-4267 from TT2 (Sessions 13921, 13924, 13925, 13927, 13929, 13947, 13948). The 4276 number has been attributed to a person believed to be SARAH PERRY ("PERRY").

**PERRY**: *Hey*

**DURE**: *Wassup*

**PERRY**: *Not too much where's good?*

**DURE**: *Chalkstone*

**PERRY**: *K coming now*

**DURE**: *How long*

**PERRY**: *I'm on Cranston St. so like not even 10 minutes*

**DURE**: *Yea jus call me I wont be ova there*

42.     Based on this text message exchange and what I have learned in this investigation, PERRY is frequently supplied narcotics from DURE and when she asks "where's good" she is asking DURE where is a good spot to meet to be supplied. DURE instructs PERRY to go to "Chalkstone" which what I know from this investigation means to meet somewhere on the Chalkstone Avenue corridor in Providence, Rhode Island.

43. At approximately 1:59 PM, while DURE was being surveilled by members of law enforcement, he was observed turning onto Rankin Avenue from Pleasant Valley Parkway. Coinciding with a GPS tracker placed on DURE's white Hyundai Sonata, DURE the turned into the driveway of TARGET PREMISES 3. DURE was momentarily at the TARGET PREMISES 3 and then continued driving away.

44. At approximately 2:05 PM, DURE received an incoming call from the 4267 number to TT2 (Session 13952). During the call DURE instructs PERRY to meet him somewhere else on North Main Street in the city of Providence because he left the area of Chalkstone Avenue.

45. At approximately 2:16 PM, DURE and PERRY exchanged the following text messages from the 4267 number and TT2 (Sessions 13955 and 13956).

**PERRY**: *I'm on DD now*

**DURE**: *Ok*

46. Members of law enforcement conducted multiple checks regarding the TARGET PREMISES 1, TARGET PREMISES 2, and the TARGET PREMISES 3 and discovered the following:

47. Based on this text message exchange, I believe that PERRY is notifying DURE that she is at their meeting location. Additionally, I also believe that "DD" means Dexterdale Road, Providence, Rhode Island. I believe this based on information I have learned in this investigation and know that DURE uses this street to deal narcotics to people.

48. At approximately 2:21 PM, with the combined use of surveillance and a GPS tracker, members of law enforcement observed DURE turn down Dexterdale Road, Providence, Rhode Island. However, the meeting was not observed by members of law enforcement due to

this taking place on a narrow side street, based on the information and conversation between DURE and PERRY it is believed that a narcotic transaction occurred in the area.

49.    Additionally, at approximately 2:23 PM, DURE received an incoming text message to TT2 from the 4267 number stating, *"U look reeeally good by the way"* indicating that DURE and PERRY saw each other.

50.    It should be noted that between leaving the TARGET PREMISES 3 and meeting with PERRY, DURE did not make any stops at any other TARGET PREMISES believed to also store narcotics.

## 1119 Douglas Avenue, Apartment 15, North Providence, RI (TARGET PREMISES 4)

## 143 Mineral Spring Avenue, Pawtucket, RI (TARGET PREMISES 5)

50.    On November 22, 2023, at approximately 12:21 PM, ELDRED placed an outgoing call to (401) 204-2930 (Session 9797). This number has been identified to belong to a person believed to be RYAN SCOTT ("SCOTT"). The following conversation is indicative of narcotic trafficking:

**SCOTT**: *Yo*

**ELDRED**: *Yo, you got it bubby, bud?*

**SCOTT**: *No whats up*

**ELDRED**: *The white girl?*

**SCOTT**: *The white girl?*

**ELDRED**: *Mm hmm*

**SCOTT**: *Alright, where you at?*

**ELDRED**: *I'm going to the Bucket.*

**SCOTT**: *Alright, where you want to meet you? I'm about to grab it, literally, right now, I'm about to pull up by the truck.*

**ELDRED**: *Ya I'm gonna be in Pawtucket at the shop.*

**SCOTT**: *Alright*

**ELDRED**: *[unintelligible] some bread for the month [unintelligible]*

**SCOTT**: *I got you.*

**ELDRED**: *[unintelligible]*

**SCOTT**: *Alright ill be right there*

51.     I believe that the during this call, ELDRED is asking SCOTT for the "white girl" which is known as a slang term for cocaine. Additionally, I know that "the shop" is a garage that ELDRED owns and is located at the TARGET PREMISES 5. Members of law enforcement initiated surveillance at the TARGET PREMISES 5 in an attempt to surveil/initiate a traffic stop on the supplier.

52.     At approximately 1:31 PM, a member of law enforcement observed a black Cadillac Escalade enter the parking lot of TARGET PREMISES 5. At approximately 1:33 PM, ELDRED received an incoming call from SCOTT on the 2930 number to TT1 (Session 9812). The following conversation occurred:

**ELDRED**: *Hello*

**SCOTT**: *Where you at bro?*

**ELDRED**: *I am about to pull up over there.*

**SCOTT**: *Alright I' ll wait here for you*

53.     Based on this call I believe that SCOTT was at TARGET PREMISES 5, and based on surveillance information, I believed that he was operating the black Escalade.

54.    At approximately 1:41 PM, ELDRED made an outgoing call to (401) 470-1529 from TT1 (Session 9813). This number is believed to be used by EFFRAIN BETANCOURT. Based on the investigation an monitoring of calls, I believe that BETANCOURT works out of TARGET PREMISES 5.  During the call, ELDRED and BETANCOURT had a conversation regarding vehicles at the garage, toward the end of the conversation, ELDRED told BETANCOURT to go outside and meet with his boy, the call abruptly ends. Based on this call, I believe that BETANCOURT was at the TARGET PREMISES 5 and ELDRED was instructing him to meet with SCOTT to get the narcotics from him however, before BETANCOURT was able to do so, the call abruptly ended.

55.    At approximately 1:43 PM, a member of law enforcement observed the Escalade drive out of the lot of TARGET PREMISES  5 but did not see ELDRED or BETANCOURT meet with the driver of the Escalade, who was believed to be SCOTT.

56.    Members of law enforcement surveilled the vehicle where they saw the license plate number, Rhode Island registration 2M428. NCIC database check indicated this vehicle belongs to KOJON HAZARD and the plates should be on a Subaru. However, a cross-agency check showed that this vehicle was stopped two weeks ago, and the operator was identified to be SCOTT.

57.    Law enforcement continuously surveilled SCOTT in the Escalade and at approximately 2:18 PM, lost visual contact and surveillance was suspended.

58.    At approximately 3:14 PM, ELDRED received an incoming call from the 2930 number to TT1 (Session 9841). During the call the following conversation occurred:

**ELDRED**: *yo*

**SCOTT**: *I' m at the Mills.*

**ELDRED**: *Alight I' m pulling up right now, I just got off Branch exit.*

**SCOTT**: *Alright*

59.    Based on this call I believe that SCOTT was at the Mills located at the TARGET

PREMISES 4. This location is where ELDRED lives. At approximately 3:38 PM, I observed

ELDRED's Nissan parked next to the Escalade in the parking lot of 1119 Douglas Avenue,

North Providence, Rhode Island.

60.    At approximately 3:40 PM, ELDRED received a call from (401) 374-0716 to

TT1. This number has been identified to be used by JOSEPH KOOLE, ELDRED's uncle.

During the call, SCOTT can be overheard with ELDRED in the background and ELDRED

identified him as "Ry-Ry."

61.    At approximately 3:49 PM, I observed the front passenger door open on the

Escalade and identified ELDRED as he exited the vehicle and walked into the common area door

for Building 3 toward the TARGET PREMISES 4.

62.    At approximately 3:57 PM, I observed the Escalade exit the parking lot and begin

driving toward downtown Providence. In anticipation of ELDRED being supplied suspected

cocaine, members of law enforcement contacted the Providence Police Department to conduct a

"wall-off" stop.

63.    At approximately 3:59 PM, at my direction, the Providence Police marked cruiser

initiated a traffic stop on the Escalade, and discovered the vehicle did not have the correct

registration, the driver of the vehicle did not have a license, and the vehicle was heavily tinted in

violation of multiple state traffic infractions.

64.    During the stop, members of law enforcement searched the vehicle for any

narcotics and firearms. Although there was approximately 12 ounces of marijuana located in the

vehicle, members of law enforcement did not locate any cocaine or other narcotics. Law enforcement identified the identity of the driver to be SCOTT who provided law enforcement with the 2930 number as his cellular telephone number. A member of law enforcement called the number in SCOTT's presence and confirmed that to be his phone number.

65.    Shortly after SCOTT was released by the Providence Police Department, ELDRED received an incoming call to TT1 from SCOTT (Session 9857) and had the following conversation:

**ELDRED**: *What's up Bro?*

**SCOTT**: *Cops just vamped me. My nigga the Mills shit hot my nigga.*

**ELDRED**: *For what?*

**SCOTT**: *My nigga there all sitting over there. My nigga there about to raid that mother fucker or something my nigga. They were just whatever my nigga. Put this on my kids my nigga. I'm just, they just let me go my nigga. They on me about a couple ounce of weed my nigga. There sitting in that Tomato City Pizza, like 10 cars deep.*

**ELDRED**: *Right in front of tomato city?*

**SCOTT**: *In the, in the you know where that fucking restaurant is? Like nigga in the parking lot. In the parking lot right now. I swear to god there are five unmarked trucks. Nigga just vamped me in an unmarked Dodge Durango, first they try to act like it was a regular pull over and then all of a sudden the nigga pulls up right in front like... my nigga you never heard my name or nuthin. All I got is some fucking weed. He like aww why should I let you go? Yo it's Thanksgiving my nigga. What the fuck is wrong with you? I'm 36 years old and you are a Sergeant in this area. You never heard of me. I don't both nobody my nigga. He's like aw yeah, your right... da da da da da.*

**ELDRED**: *[unintelligible]*

**SCOTT**: *Nigga I am telling you my nigga this… be… like whatever nigga, don' t like, as soon as I pulled out of there. I made it to the corner and I was getting yanked. I was like 'what the fuck' you know me. And you know me, I got a little bit of work on me. Thank god I switched cars my nigga. Cause if I was in the Explorer I' d have the scale in there.*

**ELDRED**: *That' s why I don' t even, you know where I be, you know where I be.*

**SCOTT**: *I' m straight, I' ll never go to that Mills again, I' m straight. I will not get vamped, I don't even get pulled over. Nigga to get vamped. I was laughing in my head. They like I could jam you up for this weed. I' m like, my nigga. You got like 12 ounces on you. I got eight, eight ounces of weed that' s a [Unintelligible and laughing]*

**ELDRED**: *[Unintelligible]*

**SCOTT**: *He' s like where are you going? I said home nigga. I live right here on Atlas Street. Look at my ID.*

**ELDRED**: *[Unintelligible]*

**SCOTT**: *… ..going over there, for real.*

**ELDRED**: *Uh huh*

**SCOTT**: *Dead ass*

**ELDRED**: *[Unintelligible]*

**SCOTT**: *I'm straight, I' m going to switch cars I will not drive this again. Dead ass. Yo. And no bullshit, I though the cop was going around me my nigga. I'm like, I'm like, I thought that it was North Providence too. It was a Providence cop, that's when I was like, alright, just smooth, you know what I'm saying, I'm like all right, then they just a little bald head nigga with green eyes. I*

*never seen this nigga a my life.*

**ELDRED**: *Alright [Unintelligible]*

    66.    Based on this call, I believe that SCOTT was calling ELDRED after SCOTT

provided the "white girl" (believed to be cocaine) to ELDRED and let ELDRED know that he

was pulled over outside of the Mills, which are located at 1119 Douglas Avenue, notifying

ELDRED that law enforcement was in the area.

    67.    On November 25, 2023, at approximately 11:57 AM, ELDRED made an outgoing

call to BETANCOURT on the 1529 number from TT1. During the call, the following

conversation occurred:

**BETANCOURT**: *Yo*

**ELDRED**: *Yo, where you at?*

**BETANCOURT**: *I'm at the crib, I just left the shop. Messing with that new engine and shit. And*

*getting everything, ya know. I put that new engine in*

**ELDRED**: *When did you pull up to the shop?*

**BETANCOURT**: *What happened?*

**ELDRED**: *When you going to the shop?*

**BETANCOURT**: *I'm going back in a few minutes, I was just gonna grab something to eat and*

*shit. I've been there, I've been there since this morning.*

**ELDRED**: *Will you be there in the next half hour?*

**BETANCOURT**: *Huh?*

**ELDRED**: *Are you gonna be going over there in the next half hour?*

**BETANCOURT**: *Yea, yea yea..Why what up?*

**ELDRED**: *Nah cause I gotta go over there and grab something.*

**BETANCOURT**: *Alright, nah. I'm about to be getting ready to head that way now. Um in a minute. And I'm also trying to look for bud too. I got the money.*

**ELDRED**: *For what?*

**BETANCOURT**: *You heard bro?*

**ELDRED**: *What happened?*

**BETANCOURT**: *I said I'm also trying to get some buds too that's why I ended up leaving to get something to eat and try to see if I can get some bud. I got the money though if anything.*

**ELDRED**: *I got some bud nigga.*

**BETANCOURT**: *Alright bet, Ima be ima get ready now and head over there.*

**ELDRED**: *I got you.*

**BETANCOURT**: *alright Im gonna head there now.*

**ELDRED**: *Alright I got you.*

**BETANCOURT**: *Alright bro.*

68.    Based on this call above, I believe that ELDRED was telling BETANCOURT that he needs to go grab narcotics from the "garage", which I know to be the TARGET PREMISES 5. I believe this to be narcotics other than marijuana because ELDRED specifically stated he needed to get weed but refrained from stating what he needed to grab on the phone, which I know that drug dealers commonly do in an attempt to thwart law enforcement if they believe their phone is being monitored.

69.    In November 2023, CS-1 was arrested on pending state charges and requested to interview with members of law enforcement. Based on CS-1 being intercepted having a conversation with TT1 in October discussing pill suppliers and putting GPS trackers on vehicles to find out where they are going, myself and a member of law enforcement interviewed him.

During which time, CS-1 informed me that he knew who COTY ELDRED was and provided his address as being the TARGET PREMISES 4. Additionally, the CS-1 explained to me that ELDRED was a large-scale, marijuana and crack-cocaine dealer. CS-1 explained that he did not believe that ELDRED kept a lot of his stash of narcotics at the TARGET PREMISES 4 but would likely have some in the residence. CS-1 explained that he knew of a garage that ELDRED owned in Pawtucket, Rhode Island that CS-1 believed to be a stash location for a majority of ELDRED's narcotics, although CS-1 did not know the address of the garage. Based on my knowledge of this investigation, I believe this location to be the TARGET PREMISES 5.

s

**86 Edgemere Avenue, Apartment 1, Providence, RI (TARGET PREMISES 6)**

**The White Dodge Durango, New York Registration: KBR-3916 (TARGET VEHICLE 2)**

70.    On November 12, 2023, at approximately 5:34 PM, DURE received an incoming call from (401) 548-4736 to TT2. This number is known to be utilized by JOHN DAILEY (Session 10070). During the call the following conversation occurred:

**DAILEY**: *Yo I'm on my way to get it right now.*

**DURE**: *Alright.*

**DAILEY**: *I'll meet you in the same area, I'll call you like. When I got it in my hand. It's not even 15 minutes.*

**DURE**: *You're good*

**DAILEY**: *Alright.*

71.    Based on this call, I believe that DAILEY is telling DURE that he is on his way right now to get an unknown narcotic to supply DURE with it, and DAILEY will call DURE back when he has it in 15 minutes.

72.     At approximately 6:49 PM, DURE is observed via pole camera arriving back at the TARGET PREMISES, in the green Tacoma.

73.     At approximately 7:08 PM, DURE received an incoming call from 4736 number to TT2 (Session 10117). During the call the following conversation occurred:

**DURE**: *Yo*

**DAILEY**: *Where you at?*

**DURE**: *Where you at nigga?*

**DAILEY**: *I'm coming, ah I'm coming, I'm about to pull up.*

**DURE**: *Ugh, I'm about to pull up (unintelligible) I was wondering, I was trying to call you if you wanted me to head there no or not.*

**DAILEY**: *Huh?*

**DURE**: *I said I was calling to see if you wanted me to head there now or not, I'm literally around the corner though.*

**DAILEY**: *Yeah, naw, I'm here.*

**DURE**: *Whats the math on that, you heard?*

**DAILEY**: *Uh, you said fifteen hundred right?*

**DURE**: *Yup.*

**DAILEY**: *Hold on.*

*(Call continues but no one speaks for 49 seconds)*

**DURE**: *What's that, twenty-six, like twenty-six huh?*

**DAILEY**: *It's 2625.*

**DURE**: *Yup, yup, yup, yup, alright.*

**DAILEY**: *You heard?*

**DURE**: *Yeah, yeah*

**DAILEY**: *2625.*

*(Overlapping voices)*

**DAILEY**: *I'm here*

**DURE**: *Aight cuz.*

**DAILEY**: *Yo.*

**DURE**: *Yup? Yeah?*

**DAILEY**: *I'm in a white Durango*

**DURE**: *Alright*

**DAILEY**: *How long?*

**DURE**: *Like fucking five minutes, not even.*

**DAILEY**: *Alright*

74.    Based on this call, I believe that DURE is being supplied 1,500 of fentanyl pills for $2,625 from DAILEY. Based on my training and experience, I do believe this may be a deal for pills at $1.75 each. Furthermore, it should be noted, members of law enforcement attempted to locate where DAILEY was, to intercept the narcotics for this deal prior to the meeting occurring but were not given a specific location based on this call.

75.    At approximately 7:09 PM, DURE was observed via pole camera, exiting the common area door of TARGET PREMISES 1 and entering the green Tacoma and departing shortly thereafter. Members of law enforcement initiated surveillance on DURE from his residence.

76.    As DURE departed the TARGET PREMISES 1, members of law enforcement observed DURE travel at a high rate of speed and make multiple U-Turns on North Main Street,

in Providence, Rhode Island. Despite these maneuvers, however, law enforcement were able to continuously surveil DURE until he arrived in the parking lot of Sukhy' Threading, at 7:14 PM, located at 85 Power Road, Pawtucket, Rhode Island.

77.    While at 85 Power Road, a member of law enforcement observed DURE exit the green Tacoma and walk toward the TARGET VEHICLE 2.

78.    At approximately 7:16 PM, I observed the TARGET VEHICLE 2 and the green Tacoma depart from 85 Power Road, Pawtucket, Rhode Island and drive south toward the city of Providence.

79.    The TARGET VEHICLE 2 and the green Tacoma were observed turning left on Smithfield Avenue, in the city of Providence, at this point, the green Tacoma continued straight and the TARGET VEHICLE 2 got onto highway 95 S. At my direction, members of law enforcement terminated surveillance on the green Tacoma and continued following the TARGET VEHICLE 2.

80.    At approximately 7:20 PM, a member of law enforcement advised that DURE arrived back at home and was observed via pole camera parking the green Tacoma and entering the common area door of his residence at the TARGET PREMISES 1.

81.    The TARGET VEHICLE 2 was continuously surveilled to the intersection of Pavilion Avenue and Rugby Street in the city of Providence, where the driver was observed by myself and members of law enforcement parking in the parking lot of 148 Pavilion Bar and Lounge, located at 148 Pavilion Avenue, Providence, Rhode Island. The driver was a tall black male, wearing a black sweatshirt and red pants. Myself or members of law enforcement could not get a good look at the face of the driver of the TARGET VEHICLE 2 due to lighting conditions, but the male did have the same physical characteristics, gait, and build as compared

to previous surveillance conducted on DAILEY during the course of this investigation. Based on the totality of the investigation and my observations of the driver of the TARGET VEHICLE 2, your affiant believes it was, DAILEY.

82.    At approximately 8:52 PM, the male, believed to be DAILEY, exited the bar and entered the front driver side door of the TARGET VEHICLE 2. Another member of law enforcement observed a passenger enter the front passenger side of the Durango as well.

83.    At approximately 9:00 PM, the driver of the TARGET VEHICLE 2, believed to be DAILEY, exited the TARGET VEHICLE 2 and went toward the front of the TARGET VEHICLE 2 out of sight of members of law enforcement. Shortly thereafter, I observed the passenger side door open and observed an unknown female exit the TARGET VEHICLE 2 and walk around toward the driver side and then return once again toward the passenger side of the TARGET VEHICLE 2.

84.    At approximately 9:02 PM, the male believed to be DAILEY walked back into the bar at 148 Pavilion Avenue.

85.    At approximately 9:16 PM, the male believed to be DAILEY exited the bar again and walked into the driver side of the TARGET VEHICLE 2.

86.    At approximately 9:20 PM, I observed the TARGET VEHICLE 2 exit the parking lot of the bar. As the TARGET VEHICLE 2 began to drive away, it continued through Rugby Street travelling at an extremely high rate of speed. At which time members of law enforcement attempted to surveil the TARGET VEHICLE 2 but momentarily lost visual sight of the vehicle.

87.    At approximately 9:23 PM, I located the TARGET VEHICLE 2, travelling at a high rate of speed on Prairie Avenue toward downtown Providence. A member of law

enforcement was able to catch up to the TARGET VEHICLE 2 and verified it was the TARGET VEHICLE 2.

88.    At approximately 9:25 PM, a member of law enforcement observed the TARGET VEHICLE 2 park on Comstock Avenue, between Prairie Avenue and Broad Street, in the city of Providence.

89.    A short while later, a member of law enforcement drove down the street on Comstock Avenue to locate the TARGET VEHICLE 2 and advised the vehicle was no longer there. During this time, surveillance was terminated.

90.    DAILEY has not been previously intercepted on the initial interception of the wire until this day. However, DAILEY has been identified from this investigation as a supplier of pills laced with fentanyl from previous controlled purchases in which DAILEY delivered ELDRED 2,000 pills over two controlled purchases. DAILEY has been identified as the user of the 4736 number

91.    On Wednesday November 22, 2023, at approximately 2:12 PM, a GPS ping for the 4736 number showed that the device was located in the vicinity of Manton Avenue and Unit Street, in the city of Providence, Rhode Island within a 592 meter radius.

92.    At approximately 2:32 PM, a member of law enforcement who conducted a grid search within the GPS ping radius located the TARGET VEHICLE 2 in the parking lot/driveway of the TARGET PREMISES 6. Additionally, members of law enforcement received information through a subpoena that DAILEY had recently used his food stamp card at the Stop and Shop on Manton Avenue. After reviewing footage of the date and time the card was used, law enforcement observed and identified DAILEY entering a vehicle that was registered to

DARSHAY WATSON. WATSON is also a top caller on DAILEY's telephone toll records, which indicates that they have a close relationship.

93.      Based on this information and the information below, I believe that the cellular telephone used by DAILEY will be located inside of TARGET PREMISES 6, as well as the keys to TARGET VEHICLE 2.

94.      Surveillance and GPS ping data confirmed that since locating the TARGET VEHICLE 2 at the TARGET PREMISES 6 on November 22, 2023, DAILEY has spent all but one night at the TARGET PREMISES 6. Additionally, a records check on the TARGET PREMISES 6 revealed the following:

     a.   The TARGET PREMISES 6 is owned by DARSHAY WATSON, who also pays for the electricity bill for the entire residence. Additionally, the gas bill is split between two units, apartment 1 and floor 2. DAILEY is the listed customer for the TARGET PREMISES 6 for the first floor and WATSON is listed as the customer for floor 2. Based on the circumstances and what investigators have learned through this investigation, it is the belief of your affiant that the TARGET PREMISES 6 encompasses both apartment 1 and floor 2.

**8 Thomas Avenue, Apartment 1, Pawtucket, RI (TARGET PREMISES 7)**

**2015 white Hyundai Sonata, Rhode Island Registration 1IW608[4] (TARGET VEHICLE 1)**

95.      On November 2, 2023, at approximately 4:23 PM, DURE placed an outgoing call from TT2 to TAVAREZ at (401) 919-9941 number (TT2 (Session 7257)). During the call the

---

[4] NCIC database check shows this vehicle to be registered to MARC A DURE; Date of Birth: 1/7/1994; Resident Address: 12 Rankin Avenue, Providence, Rhode Island; Mailing Address: 35 East Drive, Apartment 2B, Providence, Rhode Island.

following conversation occurred:

**TAVAREZ**: *Hello*

**DURE**: *Whats happening dog*

**TAVAREZ**: *Hahaha*

**DURE**: *Yeah, nah so Ima definitely check you today for the downski and Ill grab some of the girl too Ill grab some.*

**TAVAREZ**: *Okay alright yeah*

**DURE**: *Alright let me have like, let me grab like 20-30 of that of the down whatever you got over, what you got over there?*

**TAVAREZ**: *Shit you want 50? You get 50*

**DURE**: *Nah that's cool Ill take 30 of, ima take 30 of it*

**TAVAREZ**: *Alright 30 down alright*

**DURE**: *Ima take like a dolla of that girl, I'll check it out*

**TAVAREZ**: *Alright bet alright say less*

**DURE**: *Alright*

**TAVAREZ**: *Just call me when you're ready*

**DURE**: *Alright.*

96.     Based on this call, I believe that TAVAREZ is DURE's narcotic supplier. Furthermore, I know that "down" is a slang term for fentanyl and that "girl" is a slang term for cocaine and when DURE asks for "30 down" he is asking for 30 grams of fentanyl and when he asks for a "dolla of the girl", he is asking for 100 grams of cocaine.

97.     At approximately 5:11 PM, DURE placed an outgoing call to call to TAVAREZ on the 9941 number from TT2 (Session 7272). During the call the TAVAREZ and DURE had

the following conversation:

**TAVAREZ**: *Yo*

**DURE**: *Yo*

**TAVAREZ**: *Whats the word with you my brotha*

**DURE**: *When you want to get busy*

**TAVAREZ**: *You tell me I could I could come, I could be to you in like 30 to 40 minutes*

**DURE**: *Ah nah that's cool just get shit ready Im just dropping off my brother and Ima go grab the bread*

**TAVAREZ**: *Alright stay there*

**DURE**: *Alright*

98.     Based off this call, I believe that DURE asked TAVAREZ where he wanted to meet and TAVAREZ stated that he can go to him in 30 to 40 minutes. DURE then told TAVAREZ that he had to grab the "bread" which I know to be slang for cash.

99.     At approximately 5:34 PM, DURE placed an outgoing call to TAVAREZ on the 9941 number from TT2 (Session 7284). During the call DURE and TAVAREZ had the following conversation:

**TAVAREZ**: *Hello*

**DURE**: *Yo*

**TAVAREZ**: *Yo whats good baby*

**DURE**: *If you want to start heading this way you can*

**TAVAREZ**: *Alright, Im over here leaving Im Warwick right now and Im heading straight to you, ya heard?*

**DURE**: *Alright just call me whenever you gonna be ready then*

**TAVAREZ**: *Alright say that, alright*

100.    Based on this call I believe that DURE was going to have his supplier meet him wherever DURE was at and that the TAVAREZ was going to be leaving from Warwick, Rhode Island area.

101.    At approximately 6:03 PM, I observed DURE arrive at the TARGET PREMISES 1 from a pole camera. DURE arrived in a black Honda Accord, bearing the Rhode Island registration 1HQ470[5].

102.    At approximately 6:37 PM, DURE placed an outgoing call to TAVAREZ on the 9941 number from TT2 (Session 7306). During the call DURE and TAVAREZ had the following conversation:

**TAVAREZ**: *Yo*

**DURE**: *Yo yo yo*

**TAVAREZ**: *I was just about to call you where you at?*

**DURE**: *Im in the East at my crib*

**TAVAREZ**: *Alright where you want to me meet me at?*

**DURE**: *You tell me*

**TAVAREZ**: *you you you want to come to your Dukes spot?*

**DURE**: *Um yeah, you want to go to Chalkstone?*

**TAVAREZ**: *Oh Chalkstone oh there? Yeah I thought. I was talking about the Glen but yeah yeah we can go over there*

**DURE**: *you said what?*

---

[5] NCIC database checks show this vehicle to belong to LA FAMILIA AUTO REPAIR LLC, with an address of 450 Potters Ave, Providence, RI for a 2013 black Honda Accord bearing the VIN: 1HGCR2F33DA057312.

**TAVAREZ**: *The Glen the Glen but nah we can go over there. Cuz you don't even stay there no more now that I think about it right?*

**DURE**: *Nah I don't know. Im not trynna*

**TAVAREZ**: *Nah haha I already know, so where, where that where you wanna?*

**DURE**: *You going there right now though?*

**TAVAREZ**: *Yeah dead ass*

**DURE**: *Alright*

**TAVAREZ**: *So the Glen right?*

**DURE**: *Naw to Chalkstone*

**TAVAREZ**: *Chalkstone? Alright*

**DURE**: *Alright*

103.    I believe that this call was DURE and TAVAREZ picking a location to meet. Furthermore, I believe that they both agree to meet at Chalkstone Avenue, in the city of Providence. Based on my knowledge of this investigation, I further believe that DURE was implying to meet at the TARGET PREMISES 3 which is at the corner of Chalkstone Avenue and Rankin Avenue.

104.    At approximately 6:41 PM, I observed DURE exit the TARGET PREMISES 1 from a pole camera. DURE entered the black Honda Accord and drove away thereafter.

105.    At approximately 6:50 PM, DURE received an incoming call on TT2 from TAVAREZ on the 9941 number (Session 7316). During the call TAVAREZ and DURE had the following conversation:

**DURE**: *Yo*

**TAVAREZ**: *Yo you there*

**DURE**: *Im literally almost fuckin there right now*

**TAVAREZ**: *Yeah I just got off the exit myself so we be there at the same time*

**DURE**: *Alright bet*

**TAVAREZ**: *Alright*

106.    At approximately 6:58 PM, a member of law enforcement observed DURE's black Accord arrive at the TARGET PREMISES 3.

107.    At approximately 6:58 PM, DURE placed an outgoing call to the TAVAREZ on the 9941 number from TT2 (Session 7321). During the call the following conversation occurred:

**TAVAREZ**: *Yo*

**DURE**: *Yo*

**TAVAREZ**: *I'm right here going up Nuthie[?] street up that little thing*

**DURE**: *Nah Nah [unintelligible]*

**TAVAREZ**: *Nah I'm right here going up Nuthie[?]*

DURE: *Nah you know where [unintelligible] right*

**TAVAREZ**: *Yeah, hell yeah, hell yeah. Where me and Chuck be parking at and where we be meeting you right there in that parking lot.*

**DURE**: *Yup*

**TAVAREZ**: *Alright*

108.    Based off this call I believe DURE is telling TAVAREZ to meet him in the parking lot in an area they both seem familiar with and have met with "Chuck," who your affiant believes to be referring to LASSITER, a common associate both TAVAREZ and DURE share. I believe this parking lot to be across the street from the TARGET PREMISES 3, behind a

barbershop located at 987 Chalkstone Avenue, Providence, Rhode Island, where DURE has previously conducted controlled purchases and deals.

At approximately 7:05 PM, a member of law enforcement observed a white Jeep Cherokee drive down Rankin Street and also observed, a red 2018 Dodge Durango ("the Red Durango") bearing Rhode Island registration 1RU396, VIN: 1C4RDJDG2JC431626, registered to VENSON RENTALS LLC, with an address of 782 Warwick Avenue, STE 2, Warwick, Rhode Island and a mailing address for 192 Alabama Avenue, Providence, Rhode Island. DURE was then observed exiting his vehicle and walking in the direction of the the Red Durango.

109.    At approximately 7:10 PM, a member of law enforcement observed DURE return to his vehicle and observed the Red Durango leave the area and take a right onto Chalkstone Avenue. The Red Durango was surveilled and observed driving into the parking lot of Walgreens, located at 295 Academy Avenue, Providence, Rhode Island. The driver of the Red Durango was observed exiting his vehicle and identified by law enforcement as TAVAREZ (who has a distinct facial tattoo). TAVAREZ was then observed meeting with a person in a white Jeep Grand Cherokee with Massachusetts license plates. Law enforcement then observed TAVAREZ enter the Walgreens and exit shortly thereafter.

110.    At approximately 7:15 PM, a member of law enforcement observed TAVAREZ return to the Red Durango and both the Red Durango and Jeep drove out of the lot. At this time members of law enforcement identified the license plate for the Jeep to be, Massachusetts registration 3KLG45[6].

---

[6] NCIC records checks show this vehicle to be registered to YEURY A BELLIARD PEREZ, with an address of 302 Sequena Drive, Sandisfield, Massachusetts for a 2022 white Jeep, VIN: 1C4RJHDG7N8576820.

111.  At approximately 7:15 PM, DURE received an incoming call from TAVAREZ on the 9941 number to TT2 (Session 7338). During the call the following conversation occurred:

**DURE**: *Yo*

**TAVAREZ**: *Yo that pick up truck was it a coupe or or or the or the four door one.*

**DURE**: *It was like fucking weird it was like a I don't know*

**TAVAREZ**: *Bro I seen that shit again at whats it called and I hopped up at the at the Walgreens bro. Be careful with that nigga you said you seen it 3 times?*

**DURE**: *Yeah that nigga and he did some weird ass I think it might be fry or something I don't know*

**TAVAREZ**: *Nigga that nigga look like a Narc nigga I just seen him hop out and go in the whats it called it bro*

**DURE**: *Yeah fuckin right*

**TAVAREZ**: *Yeah he hopped out and went into the Walgreens bro Im telling you. I made my mans follow him right now, I just made my other mans follow him cuz he don't deal with nothing so im like follow that truck and tell me where the fuck that's shits goin bro you know what Im sayin?*

**DURE**: *Yeah*

**TAVAREZ**: *Yeah bro. I was like what the fuck. And you said you seen it 3 times?*

**DURE**: *Yeah*

**TAVAREZ**: *Yeah and and it was at the gas station, you know that right? So you must've seen it before I got even there and when I got there he went down the street again. That's weird bro. that's mad weird of that nigga bro. No fun and shit.*

**DURE**: *Yeah*

**TAVAREZ**: *That's weird man just be smooth*

**DURE**: *You know that bro*

**TAVAREZ**: *Alright brody*

**DURE**: *Alright my nigga*

**TAVAREZ**: *Alright*

    112.    Based on this call, surveillance was immediately terminated. I believe that TAVAREZ was employing counter-surveillance techniques and had a surveillance car of his own, the occupant and driver of the white Jeep, who TAVAREZ was observed with. Furthermore, it should be noted that when TAVAREZ stated that *"I just made my other mans follow him cuz he don't deal with nothing"* he implied that individual does not have a record. A criminal history check showed that the registered owner of the white Jeep, YEURY BELLIARD PEREZ does not have a criminal record.

    113.    At approximately 8:22 PM, DURE placed an outgoing call to LASSITER on the 4097 number from TT2. During the call which initially started with DURE and LASSITER talking about getting a washer a dryer, DURE told LASSITER the following:

**DURE**: *Yo you should see this cop, these niggas is tweakin on Chalkstone. Yo so why is this peep this nigga out really quick 40 Cal and shit. Right*

**LASSITER**: *What did he say?*

**DURE**: *I just checked him out and shit right. So some funny ass nigga is driving through the block and I noticed car and shit before he even got over here. Mind you bro. While on Chalkstone and shit you know what Im sayin?*

**LASSITER**: *Mhm*

**DURE**: *So Im like yo whats up with that funny ass car bro its like a pick up truck you heard?*

**LASSITER**: *Yeah*

**DURE**: *So immediately, you know I start thinking of this nigga bro you heard?*

**LASSITER**: *Chopper off the rip*

**DURE**: *So nigga, I got what! So im like yo what up! Come back! [unintelligible] He said he had his boy follow it and shit bro he said it was a Narc and shit bro*

**LASSITER**: *He said it was a Narc?*

**DURE**: *Yeah*

**LASSITER**: *He had his boy following him?*

**DURE**: *Yeah, Cal you know Cal. Cal said his boy followed it and be smooth its uh its uh Narc*

**LASSITER**: *And what kind of pickup?*

**DURE**: *It was like a grey one*

**LASSITER**: *F150? What kind of pick up?*

**DURE**: *Uhh I don't know it was like a weird one*

**LASSITER**: *And this is on on on on Chalkstone?*

**DURE**: *Yup*

**LASSITER**: *Just a couple minutes ago?*

**DURE**: *mhhmm*

**LASSITER**: *uhhh uhh*

**DURE**: *No probably like an hour*

**LASSITER**: *uhhhhh fucking uhhhh what was Cal in? He was in that Durango?*

**DURE**: *Yeah*

**LASSITER**: *Yeah It might be Chop Chop, I heard he was in a pickup*

**DURE**: *Yeah I was fucking prayin it was*

**LASSITER**: *I wish it was I wish yo forreal*

**DURE**: *My grandma and them be tight. Letting it fucking (ring ring ring) Yo but that shit happened tonight. Like what if that was a Narc bro. Bro nigga I seent in the car I don't think there was [unintelligible] in there*

**LASSITER**: *It was just one person?*

**DURE**: *Yeah*

**LASSITER**: *Yeah they usually right squaded.*

114.    Based on this call, I believe DURE is talking about his narcotic transaction with TAVAREZ, who is known to go by the nickname "Cal" which is short for his first name Calvin. Furthermore, DURE explains to LASSITER that he was meeting with him in the Red Durango, which coincides with law enforcement surveillance. DURE and LASSITER also talk about how they think it was a Narc which is a slang term for Narcotic Officer.

115.    On December 1, 2023, at approximately 4:59 PM, DURE received an incoming call from (401) 363-1063 (Session 14809). This number has been identified to belong to MICHAEL AJAYI through previous surveillance operations. During the call the following conversation occurred:

**DURE**: *Yo*

**AJAYI**: *Yo yo what's Gucci gang?*

**DURE**: *[unintelligible]*

**AJAYI**: *Shit, ain't shit, [unintelligible] pull up to you, grab something real quick.*

**DURE**: *Yeah*

**AJAYI**: *Fucking uh bet send me the addy. I'll pull up on you.*

**DURE**: *You gotta give me at least 25 minutes through bro. I just gotta see my people real quick*

*and then I'll be ready for you.*

**AJAYI**: *Alright*

**DURE**: *Alright*

**AJAYI**: *Alright*

116.    Based on this call, I believe that AJAYI wanted to be supplied with narcotics from DURE based on information I have previously learned from this investigation. Although DURE tells AJAYI that he has to "see my people real quick and then I'll be ready" indicating to me that DURE needs to see someone, more specifically his supplier, to get narcotics to be ready to meet AJAYI.

117.    At approximately 5:17 PM, DURE placed an outgoing call to the 9199 number from TT2 (Session 14816). During the call the following conversation occurred:

**TAVAREZ**: *Yeah G*

**DURE**: *Yeah I'm like 20 minutes out, not even I fucking got lost my dumbass.*

**TAVAREZ**: *Alright, I'm right here. I'm waiting for you.*

**DURE**: *Huh?*

**TAVAREZ**: *I said I'm over here waiting on you.*

**DURE**: *Alright.*

**TAVAREZ**: *Alright*

118.    Based on this call, I believe that DURE and TAVAREZ were meeting for a narcotic transaction, and based on their history in this investigation, I believe that DURE was being re-supplied by TAVAREZ. Additionally, learning through the course of this investigation that DURE utilizes secured applications and iMessage to talk to individuals it is your affiant's

belief that DURE and TAVAREZ made an agreed upon deal that was not intercepted by the Title III interception system.

119.    At approximately 5:26 PM, a member of law enforcement observed the TARGET VEHICLE 1 being driven by DURE, driving through Thomas Avenue from Columbia Avenue, in Pawtucket, Rhode Island. DURE is then observed parking the vehicle directly in front of the TARGET PREMISES 7. Also observed at the end of the street is the Red Durango, parked in front of the TARGET PREMISES 7.

120.    At approximately 5:31 PM, I received a GPS ping for DURE's phone, TT2, and TAVAREZ's phone ending in 8716, which indicated that both cellular devices were sending a signal to the same cell phone tower, which indicated both devices were in an 88 meter radius of the cell phone tower. Within the 88 meters of the cell phone tower encompassed the TARGET PREMISES 7.

121.    At approximately 5:39 PM, DURE received an incoming text message from the 1063 number (Session 14826), stating, "Over near valley in the whip, lmk wtf when you good bro." DURE responded stating "248 Morris." Based on this text message exchange, I believe that AJAYI was looking fot a location to meet DURE and DURE directed AJAYI to 248 Morris Avenue, Providence, Rhode Island to conduct a narcotic transaction.

122.    At approximately 5:41 PM, DURE was observed by a member of law enforcement departing from the front of the TARGET PREMISES 7 and entering the TARGET VEHICLE 1. The TARGET VEHICLE 1 was surveilled directly from the TARGET PREMISES 7 to the TARGET PREMISES 1 where he arrived and was observed on the pole camera by members of law enforcement entering the common area door at 5:52 PM.

123.    At approximately 5:55 PM, DURE and the 1063 number exchange the following text messages (Sessions 14842, 14844, 14846, 14848):

**AJAYI**: *Here bro*

**DURE**: *Igh give me a sec*

**DURE**: *Wat u want*

**AJAYI**: *Ight got 60*

124.    Based on this text message exchange, I believe that DURE was re-supplied by his supplier with narcotics, whom I believe to be TAVAREZ, while DURE was at the TARGET PREMISES 7. Additionally, AJAYI informs DURE he is there and wants "60" which I believe to be 60 dollars worth of narcotics or .60 grams of crack cocaine.

125.    In anticipation of a narcotics transaction taking place at 248 Morris Avenue, Providence, Rhode Island, members of law enforcement initiated surveillance in the area.

126.    At approximately 6:10 PM, DURE received an incoming call from AJAYI on the 1063 number (Session 14855). During the call DURE tells AJAYI he is about to get to the meeting location.

127.    Shortly thereafter, members of law enforcement observed DURE arrive in the area of 248 Morris Avenue, park his vehicle and exit the front driver seat, although, based on the view and the lighting conditions, members of law enforcement were unable to see who DURE met with.

128.    Members of law enforcement conducted a utilities search of the TARGET PREMISES 7 and discovered that the utilities are not paid for by TAVAREZ or any of his associates, however, a check into the calls for service inside of the Pawtucket Police Department database show that in August of 2022, the Pawtucket Police Department responded to the

TARGET PREMISES 7- FIRST FLOOR, and had a dispatched call log which shows that TAVAREZ and RIHANNA BURGO were involved parties at the TARGET PREMISES 7 for a 911 hang up call. It is your affiant's belief that TAVAREZ still resides at the TARGET PREMISES 7 and based on the December 1, 2023 meeting with DURE, he is actively supplying narcotics out of the TARGET PREMISES 7.

### FABERLLE

129.    On Monday, October 23, 2023, members of law enforcement met with CW-1 to conduct a controlled purchase of 1,000 blue fentanyl pills from ELDRED, since the start of this investigation, ELDRED is currently operating a grey Dodge Ram bearing Virginia registration TTJ-7210 which is registered to Enterprise Rentals.

130.    At approximately 11:47 AM, at my direction, the CW-1 sent a text message to ELDRED on TT1 stating *"Yo my b about that day I'm good now call me asap my b"* (Session 2538).

131.    At approximately 11:58 AM, at my direction, the CW-1 made an outgoing call to ELDRED on TT1 (Session 2539), which I observed the CW-1 dial the telephone number for TT1. The call was not answered.

132.    At approximately 11:59 AM, at my direction, the CW-1 sent a text message to ELDRED on TT1 stating, *"Yo when you can call me $$$$ is in deck"* (Session 2542)

133.    At approximately 12:05 PM, at my direction, the CW-1 placed an outgoing call to ELDRED on TT1. The call was not answered (Session 2543).

134.    At approximately 12:13 PM, the CW-1 received an incoming call from ELDRED on TT1, the call was placed on speaker for me to listen to however as the CW-1 answered the phone, the call ended, and no conversation occurred (Session 2546).

135.    At approximately 12:14 PM, at my direction, the CW-1 placed an outgoing call to ELDRED on TT1, the call was not answered (Session 2551).

136.    At approximately 12:15 PM, CW-1 received an incoming text message from ELDRED on TT1 (Session 2556) stating *"now"*.

137.    At approximately 12:16 PM, at my direction, CW-1 placed an outgoing call to ELDRED on TT1 (Session 2560), the call was placed on speaker for me to listen to and was partially recorded through the Title-III monitoring system. During the call CW-1 told ELDRED that he had the cash for the pills and was in Providence and ready to meet. ELDRED told the CW-1 that he was coming back from Fall River but would pick up the pills and meet with CW-1. Due to a system malfunction only part of the call was recorded.

138.    After hanging up with the CW-1, ELDRED received an incoming call from (401) 649-2754 (Session 2563) to TT1 but did not answer the call.

139.    At approximately 12:19 PM, ELDRED, utilizing TT1 then made an outgoing call to (774) 415-3546, the call was not answered (Session 2564).

140.    At approximately 12:20 PM, ELDRED utilized TT1, made an outgoing call to TT2, this call was also not answered.

141.    At approximately 12:21 PM, ELDRED, utilized TT1, and placed another outgoing call to (774) 415-3546 (Session 2568). The call was answered and monitored by a member of law enforcement from the wire room. The following is a transcription of the call, based on information learned after the controlled purchase, the user of the 3546 number is

believed to be PEDRO FABERLLE, YOB 1997:

**ELDRED**: *Um, remember I was telling you the other day about the Smurfs?*

**FABERLLE**: *Yeah, you need them shits still?*

**ELDRED**: *Yeah, I need the last of them*

**FABERLLE**: *Where you at?*

**ELDRED**: *I'm over here about to hit Prov.*

**FABERLLE**: *Alright, alright, Um give me, give me, give me twenty minutes.*

**ELDRED**: *Alright, um [voiceover]*

**FABERLLE**: *Ima be [unintelligible] yup, yup.*

**ELDRED**: *Alright*

**FABERLLE**: *Alright cuz*

**ELDRED**: *Yo, whats the number, whats the number?*

**FABERLLE**: *Two*

**ELDRED**: *Alright, yup, that's perfect*

**FABERLLE**: *That's valid?*

**ELDRED**: *Yeah, that's what Im saying, that's why Im trying to fuck with you.*

**FABERLLE**: *Yeah, come fuck with me.*

**ELDRED**: *Naw Im saying this is, this is twice a month though, times a month.*

**FABERLLE**: *Make sure, nigga call me bro.*

**ELDRED**: *That's what I'm saying, I would rather put bread in your pocket.*

**FABERLLE**: *Yeah, that's good. We're locked in cuz. Im gonna call you in 20 minutes.*

142.   I believe that during this call ELDRED ordered the "smurf" which is a common slang term for the blue fentanyl pills. Furthermore, I also believe ELDRED was quoted by

FABERLLE $2,000 for the 1,000 pills. Additionally, I also believe ELDRED has previously spoken to FABERLLE either in person or on another device regarding the pills.

143.    At approximately 12:30 PM, the CW-1 received an incoming text message from ELDRED on TT1 (Session 2575) stating *"We're u ganna be."* I believe ELDRED was asking the CW-1 where the CW-1 is going to be.

144.    At approximately 12:40 PM, at the direction of a member of law enforcement, the CW-1 responded to TT1 (Session 2577) stating, *"South and how much."*

145.    Between approximately 12:42 PM and 12:46 PM, the CW-1 and ELDRED engaged in the following text message exchange with TT1, all text messages sent by the CW-1 at this time were at the direction of a member of law enforcement:

**ELDRED** (Session 2578): *4.25*

**ELDRED** (Session 2579): *4250*

**ELDRED** (Session 2580): *4500*

**CW-1** (Session2581): *Mercy st I'll be at that Dunkin on Plainfield st I got a trap at mercy I'll be there fam*

**ELDRED** (Session2582): *Send address*

**CW-1** (Session 2583): *42.50 you said nah*

**ELDRED** (Session 2584): *4250*

**CW-1** (Session 2585): *Ok 4250 I got it*

**ELDRED** (Session 2586): *K*

**CW-1** (Session 2587): *672 Plainfield St I'll be there by 130 I'm not far*

**ELDRED** (Session 2588): *K*

146.    At approximately 12:48 PM, ELDRED received an incoming call from the 3546 number to TT1 (Session 2591), the call was not answered.

147.    At approximately 12:49 PM, ELDRED, utilized TT1, placed an outgoing call to the 3546 number (Session 2593), the call was not answered.

148.    At approximately 12:51 PM, ELDRED, utilized TT1, placed an outgoing call to the 3546 number (Session 2595). This call was monitored by a member of law enforcement, during the call ELDRED and FABERLLE, had the following conversation:

**ELDRED**: *You coming with me to go meet the dude, or what?*

**FABERLLE**: *Yeah, you want me to?*

**ELDRED**: *Yeah, that's what Im saying.*

**FABERLLE**: *Alright*

**ELDRED**: *So stay with me to go meet the [UI]*

**FABERLLE**: *Yeah I can come with you.*

**ELDRED**: *Alright*

**FABERLLE**: *Once I get to my crib I'll call you.*

**ELDRED**: *Yeah, but I'm leaving Prov right now though to go to Pawtucket*

**FABERLLE**: *Alright, Im over there cashing out at the, at the Market Basket, Im at the Market Basket right now. Im going straight to the crib after this.*

**ELDRED**: *Yeah so I can fucking make this [UI] cuz I got him down in Prov just waiting.*

**FABERLLE**: *Naw I'm coming bro, Im coming, Im coming. I [UI] on my way over here food shopping but Im done right now about to cash out literally right now. You heard?*

**ELDRED**: *Alright*

**FABERLLE**: *Then [UI], You know where I live right?*

**ELDRED**: *Yeah the same street as my baby mamas*

**FABERLLE**: *Yeah, Ima call you in a few minutes*

**ELDRED**: *Alright alright*

**FABERLLE**: *Alright.*

149.    I know that the mother of ELDRED's children lives at 1 Mary Street, Pawtucket, Rhode Island and based off the conversation, I believe ELDRED asked FABERLLE if he wanted to meet with the CW-1 for the controlled purchase. In anticipation of ELDRED meeting with the supplier on this street, members of law enforcement initiated surveillance in the area of Mary Street.

150.    At approximately 12:53 PM, the CW-1 received a text message from ELDRED on TT1 (Session 2597) stating "Im levin Pawtucket in 10 mins".

151.    At approximately 12:59 PM, at the direction of a member of law enforcement, the CW-1 sent a text message from ELDRED on TT1 (Session 2598) stating *"Ok perfect good looking out"*.

152.    At approximately 1:06 PM, ELDRED made an outgoing call to the 3546 number (Session 2600). This call was monitored by a member of law enforcement. During the call ELDRED and FABERLLE, the believed user of the 3546 number had the following conversation:

**FABERLLE**: *Yo*

**ELDRED**: *Yo*

**FABERLLE**: *What up, what up*

**ELDRED**: *Sup nigga. So where you at?*

**FABERLLE**: *I'm over here right now, about to get off the exit*

**ELDRED**: *You heard?*

**FABERLLE**: *Huh?*

**ELDRED**: *Headed to Pawtucket right now.*

**FABERLLE**: *Alright bet*

**ELDRED**: *Ill be there in like 8 minutes.*

**FABERLLE**: *Alright.*

153.    I believe that during this conversation, FABERLLE told ELDRED he was getting off the exit toward his house now and then ELDRED told FABERLLE that he will be there in 8 minutes.

154.    At approximately 1:17 PM, ELDRED placed an outgoing call to the 3546 number (Session 2604). This call was monitored by a member of law enforcement. During the call ELDRED told FABERLLE that he just got off the exit and FABERLLE told ELDRED he would be there in 3 minutes.

155.    At approximately 1:19 PM, members of law enforcement observed ELDRED's truck exit interstate 95 north and drive toward Mary Street. ELDRED's truck was then observed driving passed Mary Street and continuing into the city of Pawtucket.

156.    At approximately 1:19 PM, ELDRED, utilized TT1, and sent a text message to the CW-1 (Session 2607) stating *"Get off high way"*.

157.    At approximately 1:23 PM, at the direction of a member of law enforcement, the CW responded to TT1 (Session 2608) and stated *"ok"*.

158.    At approximately 1:28 PM, ELDRED made an outgoing call to the 3546 number from TT1 (Session 2611), during the call ELDRED asked where FABERLLE was and FABERLLE said he was at his house getting things from the car.

159.    At approximately 1:29 PM, a member of law enforcement observed an unknown male, later identified as FABERLLE, wearing a green jump suit out by his vehicle bearing the RI registration, UG-901[7].

160.    At approximately 1:30 PM, a member of law enforcement observed ELDRED drive south on Dexter and Barton toward Mary Street.

161.    At approximately 1:34 PM, ELDRED made an outgoing call to the 3546 number, during the call ELDRED told the user of the 3546 number that he was about to turn left on the street and the user of the 3546 number, FABERLLE, stated that he was in the street. Simultaneously, a member of law enforcement observed ELDRED's truck turning on Mary Street. Other members of law enforcement also observed him turning and believed that the vehicle was occupied by another person as well.

162.    ELDRED also texted the CW-1 at this time and stated "*Pulling up*" (Session 2622), at the direction of a member of law enforcement the CW-1 responded back immediately stating, "*My car is getting fixed I'm in a Civic rn tinted my shocks and strut and tune up then I'ma sell it*" (Session 2623) and "*Ok*" (Session 2626) and "*I'm here already*" (Session 2627).

163.    At approximately 1:35 PM, ELDRED placed an outgoing call to the 3546 number with TT1 (Session 2624). This call was monitored by a member of law enforcement. During the call ELDRED told FABERLLE to come outside.

164.    At approximately 1:36 PM ELDRED responded to the CW-1 from TT1 and stated "*K*" (Session 2628).

---

[7] This vehicle is registered to DAMIANA MAYORGA, YOB 1998, with an address of 47 Mary Street, Pawtucket, Rhode Island 02860 for a 2010 Black Hyundai Elantra, VIN: KMHDU4AU980417.

165.    At approximately 1:37 PM, a member of law enforcement observed FABERLLE in a green sweatsuit exit the rear of an apartment building at the corner of Main Street and Mary StreeT, and walk in the direction of ELDRED's vehicle.

166.    At approximately 1:39 PM, a member of law enforcement observed ELDRED's vehicle exit the parking lot it was parked in on Mary Street, and then turn right out of Mary Street towards Lonsdale Avenue and interstate 95.

167.    At approximately 1:41 PM, a member of law enforcement observed ELDRED's vehicle take exit 39B from interstate 95 S and take a right off the exit, and a left on Silver Spring Avenue.

168.    At approximately 1:47 PM, myself and another member of law enforcement searched the CW-1's person and vehicle for any unexplained amounts of money or narcotics with a negative result. The CW-1 was provided $4,250 of Official Agency Funds (OAF) and an audio/video recorder. The CW-1 was instructed to go to 672 Plainfield Street, Providence, Rhode Island, meet with ELDRED and his supplier and purchase the 1,000 blue pills from ELDRED. The CW-1 was also tasked by me to inquire about the purchase of a firearm from ELDRED while in person.

169.    ELDRED's vehicle was continuously surveilled until approximately 1:55 PM where the vehicle took a right on Rowan Street, from Chalkstone Avenue, in Providence, Rhode Island.

170.    At approximately 1:58 PM at my direction, the CW-1 sent a text message to TT1 (Session 2633) and asked ELDRED if he was close. At 2:00 PM, ELDRED responded from TT1 (Session 2634) saying "*Yea bro*".

171.    At approximately 2:05 PM, I received a GPS ping on the 3997 number indicating the device was in the vicinity of Chalkstone Avenue and Academy Avenue within 299 meters.

172.    At approximately 2:09 PM, ELDRED from TT1 sent the CW-1 a text message and stated "*I'm coming over Glenbridge now*" (Session 2636)

173.    At approximately 2:15 PM, I received a GPS ping on the 3997 number indicating the device was in the vicinity of Chalkstone Avenue and Academy Avenue within 299 meters.

174.    At approximately 2:21 PM, a member of law enforcement observed ELDRED's vehicle occupied by only ELDRED in front of 18-22 Lawn Street, Providence, Rhode Island. It should be noted that this location is within the 299 meter radius of the GPS ping.

175.    At approximately 2:23 PM, as members of law enforcement drove around the block to get a better position to surveil ELDRED they noticed that ELDRED's vehicle was gone but located the vehicle driving eastbound on Chalkstone Avenue.

176.    At approximately 2:24 PM, ELDRED placed an outgoing call to the CW-1 from TT1 (Session 2640) however the CW-1 did not answer the phone.

177.    At approximately 2:25 PM, at my direction, CW-1 returned the call of ELDRED to TT1 (Session 2642). This call was monitored and recorded by members of law enforcement from the wire room. During the call, ELDRED told the CW-1 that he was arriving, and the CW-1 told ELDRED that he was parked in front.

178.    At approximately 2:39 PM, at my direction, the CW-1 sent a text message to ELDRED on TT1 (Session 2652) stating, "*Wya my g I might have to dip*", ELDRED immediately responded from TT1 (Session 2653) saying "*here*".

179.    Simultaneously a member of law enforcement observed ELDRED's vehicle drive past the meeting location and out of his view.

180.    At approximately 2:40 PM, the CW-1 sent a text to ELDRED on TT1 (Session 2654) and told ELDRED that he was parked in the front, ELDRED responded from TT1 (Session 2655) and states "*k*".

181.    At approximately 2:42 PM, ELDRED placed an outgoing call to the CW-1 from TT1 (Session 2656) but the call was not answered. Simultaneously I observed ELDRED's vehicle pulling into the lot to meet with the CW-1.

182.    At approximately 2:43 PM, CW-1 called TT1 (Session 2658). This call was monitored and recorded by a member of law enforcement. ELDRED answered and told the CW-1 that he was in the parking lot and that he could see the CW-1. I observed ELDRED exit the front driver seat of his vehicle and enter the front passenger seat of the CW-1's vehicle. It should be noted that ELDRED's vehicle had at least one passenger inside.

183.    At approximately 2:46 PM, I observed ELDRED exit the CW-1's vehicle and enter the Dunkin Donuts at that location.

184.    The CW-1 departed the location and myself and another member of law enforcement surveilled the CW-1 to a pre-determined meeting location where the CW-1 arrived at approximately 2:51 PM.

185.    At approximately 2:52 PM, law enforcement observed ELDRED exit the Dunkin Donuts and enter the front driver seat of his vehicle. ELDRED then departed in his vehicle and was continuously surveilled.

186.    At approximately 2:56 PM, a member of law enforcement observed ELDRED drop off a male at 200 Whittier Avenue, Providence, Rhode Island. The male was described as having long hair and carrying a black bag and believed to be RICHARD PAGAN, who was in the vehicle with ELDRED before meeting with FABERLLE.

187.    At approximately 3:00 PM, I terminated surveillance.

188.    At the pre-determined meeting location, myself and another member of law enforcement searched the CW-1's person and vehicle for any money or narcotics with negative results. The CW-1 provided me with the audio and video recording device and a plastic baggie which contained approximately 1,000 blue pills that have the look, feel, and size of counterfeit m30 oxycodone pills. The CW-1 provided the following information:

189.    During the meeting with ELDRED, ELDRED placed the plastic baggie containing the pills in the center console and the CW-1 gave ELDRED the $4,250 of OAF. ELDRED then counted the money and the CW-1 talked to ELDRED regarding the purchase of a firearm. ELDRED told the CW-1 that he could get the CW-1 a firearm for $800. The CW-1 agreed to call ELDRED about the firearm at a later time and then ELDRED exited the vehicle. The CW-1 then went to the predetermined meeting location where he with me.

190.    I conducted a field-test of the counterfeit M30 oxycodone pills suspected to be laced with fentanyl which yielded a positive result for the presence of fentanyl.

191.    Myself and another member of law enforcement weighed the plastic baggie containing approximately 1000 fentanyl pills which had a gross weight of 99.2 grams. I then heat sealed the fentanyl pills which had a gross weight of 174.40 grams.

192.    I reviewed the audio and video recording device which captured ELDRED as the person who supplied the CW-1 with the 1,000 blue fentanyl pills for $4,250.

## 685 Charles Street, Apartment 1, Providence, Rhode Island (TARGET PREMISES 8)

193.    On October 31, 2023, at approximately 8:38 PM, DURE made an outgoing call from the TT2 to the (401) 390-4097 (Session 6746). During the call the following conversation occurred:

**LASSITER**: *Hello*

**DURE**: *Yo*

**LASSITER**: *Yo*

**DURE**: *You out here?*

**LASSITER**: *Kind of yeah*

**DURE**: *Fuckin go check this nigga Benson [?] off*

**LASSITER**: *He got a straight 40?*

**DURE**: *Haha Yeah*

**LASSITER**: *Alright yup I' m right over there*

**DURE**: *Alright facts*

**LASSITER**: *Yup*

194.    Based on this call, I believe that DURE is utilizing LASSITER to do a narcotics deal on his behalf. Often times, these individuals are called "runners" meaning that a narcotic supplier uses other people to sell drugs on their behalf.

195.    At approximately 8:40 PM, DURE received an incoming text message from (401) 309-3858 ("the 3858 number") to TT1 (Session 6747). This number is believed to be utilized by MARK KELLEY, DOB: 5/7/1974. The text states: *"You still getting that ca dy."* I believe that based on this text message, KELLEY is asking DURE if he is still getting that "candy" or if he is ready and available to meet with him for narcotics, based on previous information learned in this investigation.

196.    At approximately 8:41 PM, DURE made an outgoing call from the TT1 to the 4097 number (Session 6748). During the call the following conversation occurred:

**LASSITER**: *Hello.*

**DURE**: *Yo.*

**LASSITER**: *Yeah Im [unintelligible] right now, his ass.*

**DURE**: *Nah nigga you're good he ain't going nowhere. I'm just going to fucking I don't feel like coming outside I'm kind of like lazy. So fucking I'm going to let you catch that. I got him and someone else too bro. He probably got like. [unintelligible]*

**LASSITER**: *Yeah buddy! That's my Buddy!*

**DURE**: *[Unintelligible]*

**LASSITER**: *What for the down shit or the other shit?*

**DURE**: *Gonna be like half.*

**LASSITER**: *I got it, yup.*

**DURE**: *Alright.*

**LASSITER**: *Alright, yo! Tell Benson to come outside.*

**DURE**: *Alright.*

197.    Based on this call, I believe that LASSITER is telling DURE to call an unknown male named Benson to come outside and do the deal. Additionally, DURE is telling LASSITER that he has another deal for him and instructed him that the other person was going to want half and half of narcotics. The narcotics he is specifically asking for are unknown however, LASSITER references "down" which I know to be a slang term for heroin or a regent of it.

198.    At approximately 8:42 PM, DURE places an outgoing call from TT1 to the 3858 number (Session 6749). During the call the following conversation occurs:

**KELLEY**: *What's up?*

**DURE**: *Where you gonna be at your crib?*

**KELLEY**: *Um I'm at the spot or you want me to head home right? It's up to you.*

**DURE**: *Yea just head to your house I'm gonna send my brother over there you heard?*

**KELLEY**: *Alright alright I'll probably be over there in like 15 20 alright?*

**DURE**: *What you want?*

**KELLEY**: *Um I only got money I've only got like $50 [IA]*

**DURE**: *Alright that's cool.*

**KELLEY**: *Alright*

**DURE**: *I'll tell him to um I'll see what he got on him he be different than me*

**KELLEY**: *Yea*

**DURE**: *Yea but imma make him make him make it work.*

**KELLEY**: *Alright cool. Thank you man. Alright*

    199.    Based on this call, I believe that DURE is telling KELLEY that he is going to be sending his "brother" to him and instructs KELLEY to back to his (KELLEY'S) house to meet him. Additionally, I believe that when DURE is referencing his brother, he is talking about LASSITER, based on the previous intercepted phone calls.

    200.    At approximately 8:42 PM, DURE made an outgoing call from TT1 to the 4097 number (Session 6752). During the call the following conversation occurred:

**LASSITER**: *Where am I gunna meet him because I am right next to. [unintelligible]*

**DURE**: *member member where you and meet went the other day in Pawtucket.*

**LASSITER**: *Um give me a little like.*

**DURE**: *Member where we was sitting waiting for him remember? Came walking out the building by the manor.*

**LASSITER**: *yeah yup in that building yup.*

**DURE**: *Alright.*

**LASSITER**: *Alright Ima call you when I'm over there.*

201.    Based on this call, I believe that DURE is instructing LASSITER to meet KELLEY in Pawtucket and explains that it is a location that DURE has previously taken LASSITER to meet KELLEY.

202.    At approximately 8:59 PM, DURE received an incoming call from the 4097 number to TT2 (Session 6755). The following is a transcription of the conversation:

**LASSITER**: *Brotha.*

**DURE**: *Yo.*

**LASSITER**: *Tell that nigga come out here. Um, you think I should give him 2 of the other shit or the? Just tell him to come out.*

**DURE**: *Why what do you got?*

**LASSITER**: *Nah I got whatever, I don't got it bagged I mean the hardy bagged.*

**DURE**: *Yeah so fuck it, give him the hard and the down. Just give him two small shits.*

**LASSITER**: *Alright.*

**DURE**: *If you want alright, Ima tell him right now.*

**LASSITER**: *Alright.*

**DURE**: *So [unintelligible] yeah make sure you like peep that parking lot.*

**LASSITER**: *Absolutely.*

**DURE**: *That parking lot be weird looking.*

**LASSITER**: *Hell Yeah.*

**DURE**: *I'll usually park next to the gym or somethin.*

**LASSITER**: *Im a park where we park right in the front.*

**DURE**: *Yeah that's straight just be on alert right there.*

**LASSITER**: *Alright.*

**DURE**: *I did that that day cuz it didn't look like no cars was right there Ima tell him right now so he can be fast.*

**LASSITER**: *Alright.*

203.    Based on the call, I believe that DURE and LASSITER are talking about how much narcotics and what type of narcotics to give KELLEY. When DURE tells LASSITER to give him the hard and the down, I believe he is telling LASSITER to give him a gram of crack cocaine and a gram of heroin or a regent thereof. I believe this because I know "hard" to be a common slang term used by narcotics dealers to mean crack cocaine, additionally I know "down" to mean heroin or a regent thereof.

204.    Members of law enforcement have previously conducted surveillance between meetings with DURE and KELLEY and know the location DURE is speaking of during this call to mean 560 Mineral Springs Avenue, Pawtucket, Rhode Island. This location is also the registered address for KELLEY. Based off this call, members of the surveillance team initiated surveillance at 560 Mineral Springs Avenue, Pawtucket, Rhode Island near the boxing gym in the area.

205.    At approximately 9:00 PM, DURE placed an outgoing call to the 3858 number from TT2 (Session 6756). The call was partially recorded and captured the end of the conversation. During the call KELLEY can be overheard telling DURE that he is on the way home now and DURE says alright. Based on this call, I believe that KELLEY is not at home yet and is on the bus but will be there soon.

206.    At approximately 9:01 PM, DURE had a conversation from TT2 with the 4097

number (Session 6758). During the call the following conversation occurred:

**LASSITER**: *Yo.*

**DURE**: *Yeah I forgot his ass is almost there cuz.*

**LASSITER**: *He wasn't there?*

**DURE**: *Nah I forgot he was over here on this side. I told him, I told him that you were. I should have just told him that you would have met him over here.*

**LASSITER**: *Oh yeah. [overlapping] What's he in? So I could just--*

**DURE**: *He's on the bus.*

**LASSITER**: *Oh man.*

**DURE**: *I'm already hit. Might as well roll a little blunt. Let me see how long he's gonna take, hold on. I'll tell his ass to get off right now.*

**LASSITER**: *Alright.*

**DURE**: *Hold on.*

207.    Based on this call, DURE is telling LASSITER that he forgot that KELLEY was

not at his house yet and that he is going to be on his way. DURE tells LASSITER that he is

going to tell KELLEY to get off the bus so that LASSITER can meet him wherever he gets off

at.

208.    At approximately 9:01 PM, DURE placed an outgoing call to KELLEY on the

3858 number from TT2 (Session 6760). During the call the following conversation occurred:

**KELLEY**: *[Inaudible] right near the highway.*

**DURE**: *That's where you're getting off?*

**KELLEY**: *Well I'm right down the street from it I just have to work over there. And then I gotta*

*walk to my house which is like 10 takes like 10 minutes to walk to my house.*

**DURE***: Alright but where do you want him to meet you bro?*

**KELLEY***: Have him meet me at the mobile station that's fine.*

**DURE***: Where the fuck is..*

209.    Based on this call, I believe KELLEY is telling DURE that he is getting off the bus and needs to walk toward his house and KELLEY tells DURE that he can meet with LASSITER at the Mobile Station. I know this Mobile Station to be located at 168 Lonsdale Avenue, Pawtucket, Rhode Island based on the address which KELLEY lives and the anticipated meeting location.

210.    At approximately 9:02 PM, DURE placed an outgoing call to (888) 111-2663[8] from TT2 (Session 6764). This call was a 3-way conversation between DURE, LASSITER, and KELLEY. During the call KELLEY explains that he is off the bus walking near the Mobile station is walking on Lonsdale. The call stayed open and during the call LASSITER agrees to pick up KELLEY who is walking. The call abruptly ends. Although, the phone numbers where not listed for LASSITER and KELLEY, I am familiar with their voices based off the interceptions of this investigation and know that it was both LASSITER and KELLEY on the phone with DURE.

211.    At approximately 9:03 PM, a member of law enforcement observed a Ford SUV do a U-Turn in the parking lot of 560 Mineral Spring Avenue, Pawtucket, Rhode Island.

212.    At approximately 9:04 PM, a member of law enforcement observed the Ford SUV that made the U-Turn behind the McDonalds in the parking lot at the intersection of Mineral Spring Avenue and Lonsdale Avenue.

---

[8] This telephone number is not an existing number, however I have learned during three-way phone calls, the FBI Title III monitoring system processes them by applying the (888) 111-2663 number to the call as the number dialed.

213.    At approximately 9:05 PM, DURE, LASSITER, and KELLEY are overheard from TT2 on a 3-way call (Session 6765). During the call KELLEY and LASSITER are trying to locate each other and KELLEY tells him that he is going to stop walking because he will be in the middle of the highway bridge. LASSITER tells KELLEY he is just passing the Mobile Station and about to pass the bridge and the two state they see each other and the call ends.

214.    While this call is occurring, a member of law enforcement observed the Ford SUV bearing a Florida registration: AS93HS[9] travelling south on Lonsdale and picking up a white male by the bridge. This male was later identified as KELLEY. The SUV made a U-turn and began to travel back toward the 560 Mineral Spring Avenue location. It should be noted, members of law enforcement are familiar with the look and appearance of KELLEY based on previous surveillance and photographs provided to all members of the surveillance team.

215.    At approximately 9:10 PM, after being continuously surveilled by the surveillance team, a member of law enforcement observed the same Ford SUV with the Florida registration entering the parking lot of 560 Mineral Spring Avenue, and observed KELLEY exit the passenger side door and enter the large building complex.

216.    The vehicle then departed the area at a high rate of speed and although members of the surveillance team were able to keep up with the vehicle, surveillance was terminated shortly thereafter.

217.    On November 24, 2023, at approximately 8:04 PM, DURE made an outgoing call to (401) 288-8840 (Session 12770). This number has been identified belonging to ERNESTO

---

[9] NCIC checks for the Ford SUV bearing Florida Registration: AS93HS show the vehicle to be registered to EAN Holdings, or Enterprise Rental, with an address of 14002 E 21st St, STE 1500, Tulsa, OK 74134-1424 for a Grey 2022 Ford with VIN: 2FMPK4K91NBB07782.
A subpoena for the renter information from Enterprise was served and shows the renter to be Ashlynn Jackson; Address: 30 Dixon Street, Providence, Rhode Island 02907; DOB: 6/24/1993; DL Number: 3311186 RI; Email: ashlynnjackson28@gmail.com; Phone numbers: (401) 954-1470 and TT7

MARTINEZ-NUNEZ, who provided this phone number to the Providence Police Department in

October 2023 after being shot in the stomach. During the call, DURE asked if MARTINEZ-

NUNEZ had some [unintelligible], and that he was going to pick up Chuck. Although the audio

was unintelligible regarding what DURE was asking, for, I believe that DURE was asking

MARTINEZ-NUNEZ for narcotics based on what I have learned in this investigation and the

way that DURE talks to other individuals when he is purchasing narcotics.

218.    At approximately 8:10 PM, following a GPS tracker placed on DURE's vehicle,

DURE was stopped directly in front of 686 Charles Street, Providence, Rhode Island.

219.    At approximately 8:12 PM, DURE received a call from the 8840 number (Session

12773). During the call, MARTINEZ-NUNEZ asked DURE how long he will be to get to the

meeting location, to which DURE responds that he does not know. MARTINEZ-NUNEZ stated

he had to go down the street and will go back to the meeting spot after.

220.    At approximately 8:23 PM, a member of law enforcement observed and identified

LASSITER and an unknown female walk from the direction of the TARGET PREMISES 8,

after parking a vehicle in front of it and toward DURE's vehicle and entering the vehicle.

221.    DURE departed the location with LASSITER and the unknown female and was

surveilled directly to 24 Toledo Avenue, Pawtucket, Rhode Island where they arrived at 8:26

PM.

222.    At approximately 8:26 PM, DURE placed an outgoing call to MARTINEZ-

NUNEZ, and had the following conversation:

**MARTINEZ-NUNEZ**: *Yo*

**DURE**: *Bro that's you bro?*

**MARTINEZ-NUNEZ**: *Yeah*

**DURE**: *I'm right here. I'm kind of, I'm kind of a little deep. I got my boy and his uh, you know I'm talking, I got him and his lady with me bro. Uh you wanna come right here?*

**MARTINEZ-NUNEZ**: *Alright bet.*

223.    Based on this call, I believe that DURE is asking MARTINEZ-NUNEZ to get into DURE's vehicle because he has LASSITER and LASSITER's girlfriend.

224.    At 8:29 PM, a member of law enforcement observed a Honda that was backed into a parking space and did not have a front plate that was unoccupied and appeared to be on and running, indicating the driver of this vehicle was meeting with DURE, LASSITER, and the unknown female.

225.    At approximately 8:30 PM, members of law enforcement observed the Honda as it began to drive away and simultaneously, TT2 made an outgoing call to the 8840 number (Session 12781). During the call, LASSITER was utilizing DURE's phone to talk to MARTINEZ-NUNEZ.

**DURE**: *Yeah?*

**MARTINEZ-NUNEZ**: *Yo yo*

**LASSITER**: *Hey bro you, you think you wanna switch this one for me bro?*

**MARTINEZ-NUNEZ**: *You don't think it's [unintelligible]*

**LASSITER**: *This one looks a little light.*

**MARTINEZ-NUNEZ**: *Alright bet nah shit no more, I got you bro. I'm gonna swing back right now.*

**LASSITER**: *Yeah cuz that's what I was [unintelligible].*

**MARTINEZ-NUNEZ**: *Oh fucking whi-which one you want?*

**LASSITER**: *I don't care, just another one, I don't know.*

**MARTINEZ-NUNEZ**: *That one looks light?*

**LASSITER**: *Yeah just [unintelligible]*

**MARTINEZ-NUNEZ**: *Yeah nah no bullshit, I get it pre-bagged but I'm – Imma make sure I check, I double check that one no bullshit.*

**LASSITER**: *Look at this shit man, don't look like one. Look like two [unintelligible]*

**DURE**: *I thought I had the scale here. I'm gunna have to check.*

**MARTINEZ-NUNEZ**: *Yeah hell yeah, that would've been clutch no bullshit. Nah I got you though. I'm swinging back right now bro.*

**LASSITER**: *Alright.*

**MARTINEZ-NUNEZ**: *Alright bye.*

226.     Based on this call, I believe that MARTINEZ-NUNEZ provided DURE and LASSITER with an unknown narcotic, however whichever narcotics was paid for and ordered by LASSITER did not weigh the correct amount and LASSITER asked MARTINEZ-NUNEZ to go back to trade it for another baggie that had the correct amount. MARTINEZ-NUNEZ explained that he sells it how he gets it packaged but would come back and trade it for another one.

227.     At approximately 8:31 PM, a member of law enforcement observed the Honda drive back around and park nose in next to DURE's vehicle, while parking, DURE's vehicle adjusted its location in the parking lot, blocking the vehicle from law enforcement view.

228.     At approximately 8:33 PM, the Honda drove away and members of law enforcement attempted to surveil the vehicle and retrieved a Rhode Island license plate of SC-921. Shortly thereafter, surveillance was terminated as the vehicle began driving at a high-rate of speed causing unsafe conditions to follow.

229.    At approximately 8:38 PM, following a GPS tracker, DURE's vehicle was parked in the area of the TARGET PREMISES 8.   Although members of law enforcement did not observe LASSITER and his girlfriend exit DURE's vehicle and enter TARGET PREMISES 8, they continued to surveil DURE's vehicle and monitor his calls, which indicated that DURE no longer had any passengers, shortly after stopping in the area of the TARGET PREMISES 8.

230.    On December 2, 2023, members of law enforcement conducted surveillance utilizing air technology to take photographs of the TARGET PREMISES 8. During which time, members of law enforcement observed and photographed the grey Ford SUV bearing the Florida registration AS93HS parked directly next to the common entry door. This vehicle has previously been associated with LASSITER, which he operated on October 31, 2023.

231.    At approximately 9:41 PM, DURE received an incoming call on TT2 from the 4097 number (Session 15049). During the call DURE and LASSITER had the following conversation:

**LASSITER**: *You leaving the crib or naw?*

**DURE**: *Yeah, I'm about to come out right now.*

**LASSITER**: *Come just come and slide to my house*

**DURE**: *Alright.*

**LASSITER**: *Alright.*

232.    Based on this call, I believed that LASSITER is asking DURE if he is going to come around and tells DURE to go straight to his house.

233.    In anticipation of DURE going to LASSITER's house, members of law enforcement initiated surveillance at the TARGET PREMISES 8.

234.    At approximately 10:17 PM, DURE made an outgoing call from TT2 to the 4097 number (Session 15055). During the call, DURE and LASSITER had the following conversation:

**LASSITER**: *Yo*

**DURE**: *Yeah, I'm out here.*

**LASSITER**: *Alright.*

**DURE**: *Fuck is going on?*

**LASSITER**: *Where? In the front or the back?*

**DURE**: *On this little side street. Some Africans are following but I'm coming up. Coming through the front.*

**LASSITER**: *Alright.*

235.    Based on this call, I believe that DURE is telling LASSITER that he believes that he is being followed by the "Africans." Additionally, DURE tells LASSITER that he is going to be going through the front of the building. I also know based on surveillance that there is a front door and back door to the TARGET PREMISES 8.

236.    At approximately 10:18 PM, DURE makes an outgoing call to the 4097 number from TT2 (Session 15056). During the call the following conversation occurred:

**LASSITER**: *Yo*

**DURE**: *Yo let me bring this tenner or you gonna put it on [unintelligible]*

**LASSITER**: *Yeah bring it up, bring it up, bring it up*

**DURE**: *Alright*

237.    Based on this call, I believe that DURE is asking LASSITER if he wants a "tenner" which I believe to be slang term for 10 grams of a narcotic, however based on this call, there is not enough information to determine what kind of narcotic this was.

238.    At approximately 10:19 PM, a member of law enforcement observed the TARGET VEHICLE 1 arrive and park directly in front of the TARGET PREMISES 8. DURE was identified exiting the driver door of the TARGET VEHICLE 1 and walking up the exterior stairs toward the TARGET PREMISES 8. Based on the location of the TARGET PREMISES 8 in relation to the street, members of law enforcement were not able to observe DURE enter the TARGET PREMISES 8 from the street.

239.    At approximately 10:25 PM, members of law enforcement observed DURE as he was walking down the exterior stairs of the TARGET PREMISES 8 down toward the TARGET VEHICLE 1. DURE entered the TARGET VEHICLE 1 and made an immediate U-Turn then took a left on Paul Street and took an immediate left into a driveway that leads to the parking lot of the rear of the TARGET PREMISES 8.

240.    At approximately 10:28 PM, the TARGET VEHICLE 1 was observed exiting from the parking lot back onto Paul Street, where the vehicle accelerated away at a high rate of speed and ran through a red light. Members of law enforcement believe that DURE thought he was being following by people based on the call from Session 15055 and was attempting to evade all vehicles in the vicinity.

241.    Members of law enforcement conducted multiple checks regarding the TARGET PREMISES 8 and discovered the following:

a.  ASHLYNN JACKSON, who has previously been listed as LASSITER's girlfriend through WINFACTS, is the active customer for the utilities for the

TARGET PREMISES 8. Additionally, GPS on the 4097 number indicate that

LASSITER is in the vicinity of the TARGET PREMISES 8. Mail is delivered to

and the ulitities indicate she is the resident of the first floor.


### ROBERT HOGAN's Person (TARGET PERSON HOGAN)

### 26 Becker Street, Johnston, Rhode Island (TARGET PREMISES 9)

### 2019 Black Chevy Truck, Rhode Island registration: 1FK712[10] (TARGET VEHICLE 3)

242.    On October 21, 2023, at approximately 1:42 PM, DURE received an incoming

call from (401) 644-8205. This phone number has been identified to be used by Robert HOGAN.

During the call the following conversation occurred:

**DURE**: *Whats up bro, what do you want? How much do you want? What do you want bro?*

**HOGAN**: *I wanted to get a nice 80 off you for [unintelligible] smoking.*

**DURE**: *Alright, where you at bro? Where you at?*

**HOGAN**: *Um, right now Im, Im uhh right next to um Federal Hill.*

**DURE**: *Alright.*

**HOGAN**: *And I gotta go get Larry at 2:00 or [unintelligible]*

**DURE**: *And for 80 bucks bro? Hold on, I don't even got my other phone.*

**HOGAN**: *80 I got 80*

**DURE**: *Yeah 80 bucks what I give you is that's that bro. You can go buy from someone else*

*[unintelligible]*

**HOGAN**: *[unintelligible]*

**DURE**: *Somebody will give you .4 for 80 bucks, you know what Im saying?*

---

[10] NCIC database checks show this vehicle to be registered to HOGAN for a 2019 black Chevy, with an address of the TARGET PREMISES 9.

**HOGAN**: *Im sorry youre having a bad day but*

**DURE**: *Bro, I'm not. Listen, I'm not having a bad day, every time, hold on, hear me out real quick Robbie.*

**HOGAN**: *Ill call you back*

**DURE**: *Every fucking time you call me, I, Nigga and you start doing that dumb shit cuz I fucking look out for you guy. That's what pisses me off!*

**HOGAN**: *I know you do and that's why I call you all the time.*

**DURE**: *The fuck. I give you one, one this that for 70 bucks and you're crying about it.*

**HOGAN**: *That's why I only call you. Im not crying.*

**DURE**: *Niggas are [unintelligible] .4, the fuck.*

**HOGAN**: *I don't have a scale on me, I don't know the value.*

**DURE**: *Yeah exactly, you don't! I do Nigga, I use a scale nigga! Don't tell me what Im doing bro! I do this shit Nigga! I do this shit! The fuck outta here.*

243.    This call continued on, DURE told HOGAN that he almost got arrested yesterday and that he was almost set up. HOGAN told DURE, *"Hell yeah, I know how it is, You don't think I got something clipped under my short piece just because just because? This shit pops off I gotta be gassed up too, I got my shit fuckin duct taped to my truck."*

244.    I understand this entire conversation to mean that DURE and HOGAN were having an argument about how much narcotics DURE was giving HOGAN for the amount of cash HOGAN was giving DURE. They then talk about almost being set up, which I also believe DURE was talking about the instance when he was pulled over, and based on my own training and experience I further believe that HOGAN was implying that he has a firearm in his vehicle taped to his truck.

245.    Following this conversation, at approximately 1:57 PM, members of law enforcement surveilled a meeting with DURE and HOGAN and observed them conduct a hand-to-hand exchange. Simultaneously DURE was on a call with HOGAN (Session 3824) and had the following conversation:

**DURE**: *Yeah, I see you hold on.*

**HOGAN**: *Do you have anything else with you?*

**DURE**: *[unintelligible]*

**HOGAN**: *Do you have that thing with you?*

**DURE**: *No I don't*

**HOGAN**: *That's ok, that's alright. Alright, Ill hit you up after, before I go to my dads.*

**DURE**: *I have half of it.*

**HOGAN**: *I got you. I have something else, I don't need it. Alright buddy.*

246.    Based off my training and experience I believe this was a conversation about two different types of narcotics that DURE was dealing to HOGAN. It is believed that the narcotics are both fentanyl and crack cocaine, based on information learned during this investigation.

247.    HOGAN has been identified by members of law enforcement during several believed narcotic transactions on October 14th, 15th, 16th, 19th, 20th, and 21st. Furthermore, HOGAN was identified to be driving in the TARGET VEHICLE 3.

248.    On November 6, 2023, a member of law enforcement conducted surveillance at the TARGET PREMISES 9, and located a vehicle bearing the Rhode Island registration: LB702[11]

---

[11] NCIC database checks show that this vehicle is registered to HOGAN, for a 2008 red Ford, with an address of the TARGET PREMISES 10.

249.   Members of law enforcement conducted multiple checks regarding the TARGET PREMISES 10 and discovered the following:

    a.   TARGET PREMISES 9 is owned by LARRY STEWART, however HOGAN has TARGET PREMISES 9 listed as his primary residence. HOGAN is a listed and registered sex offender for a 2022 conviction of Electronically Disseminating Indecent Material to a Minor, receiving a felony conviction on his record, additionally in 2022 HOGAN was charged and convicted for Sexual Offender Address Change and received another felony conviction and served 1.5 years in jail. HOGAN's address that he was required by law to register as a sex offender has since been listed as the TARGET PREMISES 9.

250.   Your affiant believes that based on his statements made to DURE regarding a firearm, that HOGAN is in possession of a firearm while being a prohibited person, inside of the TARGET VEHICLE 3. I also believe that the telephone HOGAN used to communicate with DURE and discussing his illegal possession of firearms will be located in TARGET PREMISES 9.

251.   Additionally, since the start of interception of TT2 on October 14, 2023, through December 4, 2023, HOGAN has been intercepted with audio calls and text messages approximately 161 times, either ordering or coordinating the delivery of narcotics, believed to be crack cocaine from DURE. This has resulted in at least 16 known transactions of narcotics between DURE and HOGAN with the most recent transaction being surveilled by law enforcement on November 28, 2023, and continuous spot checks on the TARGET PREMISES 9

have shown that the TARGET VEHICLE 3 is at the TARGET PREMISES 9 overnight and at the location in the morning.

**298 Pawtucket Avenue, Apartment 6, Providence, Rhode Island (TARGET PREMISES 10)**

252.    On October 20, 2023, at approximately 1:26 PM, ELDRED received an incoming call from (401) 499-4334 (Session 1934) to TT1. This number has been attributed to CARLOS RODRIGUEZ, based on information learned on November 29, 2023, and will be further described in this affidavit. The following conversation occurred between ELDRED and the RODRIGUEZ.

**ELDRED**: *Whats up baby?*

**RODRIGUEZ**: *What's good with you bro, how you doing?*

**ELDRED**: *I'm alright, I'm alright, chilling chilling! I was going to ask you [unintelligible] you got the blue smurfs? [unintelligible]*

**RODRIGUEZ**: *Don't you want some?*

**ELDRED**: *Yeah the blue Smurfs.*

**RODRIGUEZ**: *Not right now, Imma hit you up though. Im waiting that's why.*

**ELDRED**: *Shit lock the number in nigga and call me you know what it is.*

253.    I know that when ELDRED was asking about the "blue Smurfs" he was asking about the counterfeit M30 oxycodone pills. Blue Smurfs is a common slang term used by narcotic dealers and traffickers to describe blue fentanyl pills.

254.    On October 31, 2023, myself and another member of law enforcement met with CW-1 to conduct a controlled purchase of 1,000 fentanyl pills for $4,250 from ELDRED. It should be noted for the entirety of this controlled purchase, I observed that CW-1 placed either a

phone call or text message to the number for TT1 and verified through tolls for each and every occasion.

255.    At approximately 10:28 AM, at my direction, CW-1 placed a consensually recorded and monitored call to TT1 (Session 4717), which I observed was the number to TT1. During the call CW-1 asked ELDRED about the 1,000 pills and told ELDRED he was in Providence. ELDRED told CW-1 that he already has them and will call the guy for them.

256.    At approximately 10:32 PM, ELDRED placed an outgoing call to (401) 417-0751[12] from TT1 (Session 4722). The user of this device has not been identified and will be described hereinafter as ("UM0751"). During the call the following conversation occurs:

**UM0751**: *Whats good my guy.*

**ELDRED**: *Yeah, you ready for us?*

**UM0751**: *Yeah Im about to call right now*

**ELDRED**: *Yeah call it right now, go grab it right now, cuz homeboy down here already*

**UM0751**: *Alright Ima call right now*

**ELDRED**: *Alright yup.*

**UM0751**: *Alright my boy.*

257.    I believe that based on this conversation the UM0751 is not the direct supplier of narcotics but can call someone who is the direct supplier of narcotics and was going to call him as soon as possible.

258.    At 10:33 AM, the CW-1 received a call from ELDRED on TT1, the call was placed on speaker for me to listen and consensually record. During the call ELDRED told the CW-1, *"I just got off the phone with him he said he was going to grab them right now."* I

---

[12] This phone number is subscribed to BRITTANY CICILLINE-MONROE.

understand this to mean that ELDRED got off the phone with his supplier and he is going to go grab the pills right now.

259.    In anticipation of a controlled purchase taking place, members of law enforcement located ELDRED at 1 Mary Street, Pawtucket, Rhode Island at approximately 10:39 AM.

260.    At approximately 10:45 AM, a member of law enforcement observed ELDRED exit the residence and enter a U-Haul truck bearing Arizona license plate AK-10147.

261.    At approximately 10:46 AM, ELDRED was surveilled by members of law enforcement from 1 Mary Street, Pawtucket, Rhode Island to an Aluminum & Copper Recycling, located at 68 Salem Street, Providence, Rhode Island.

262.    At approximately 11:01 AM, ELDRED was observed exiting the Aluminum & Copper Recycling Center and went to a gas station on Grant Avenue and Cranston Street in Cranston, Rhode Island.

263.    At approximately 11:10 AM, ELDRED was observed leaving the gas station and was surveilled directly back to Mary Street, Pawtucket, Rhode Island by members of law enforcement.

264.    At approximately 11:11 AM, ELDRED placed an outgoing call from TT1 to (774) 441-2336 (Session 4733). This number has been attributed to ELDRED's sister Michelle ELDRED, during the call ELDRED asks his sister if she can pick him up and take him to go get his truck. I believe this conversation meant ELDRED was going to drop off the U-Haul truck and needed a ride from his sister to pick up his own vehicle.

265.    At approximately 11:33 AM, ELDRED was observed leaving 1 Mary Street directly to a U-Haul service center.

266.    At approximately 11:40 AM, at my direction, the CW-1 placed two outgoing calls to ELDRED on TT1 (Session 4752 and Session 4754), neither of these calls were answered and the phone went straight to voicemail.

267.    At approximately 11:41 AM, at my direction, the CW-1 placed an outgoing text message to ELDRED on TT1. This text did not go through, and a session was not recorded.

268.    At approximately 11:58 AM, ELDRED had a conversation with an unknown number from TT1 (Session 4760). It should be noted the Title III monitoring system recorded the call but did not provide a phone number or whether the call was incoming or outgoing. Toll records were analyzed, and the call was not on the toll records for this time. The following is a transcription of the intercepted conversation with an Unknown Male (UM1):

**UM1**: *Hello?*

**ELDRED**: *Yo*

**UM1**: *Yo wassup birdie I am over here waitin on this nigga right now*

**ELDRED**: *What he say though?*

**UM1**: *That nigga told me 30 minutes*

**ELDRED**: *For sure for sure*

**UM1**: *That's what he said that nigga said for sure for sure but you know how it goes?*

**ELDRED**: *Nah I know that why I been calling him*

**UM1**: *But im on his ass, Im on his ass, Im on his ass, I need that too trust me*

**ELDRED**: *Alright*

**UM1**: *you know that, Im going to call him again right now*

**ELDRED**: *Alright*

**UM1**: *Alright bet.*

269.    Based on this call, I believe that the UM1, ELDRED is talking to, is in contact with the supplier for the pills and that ELDRED is calling this UM1 to find out what is taking so long and when they will meet.

270.    At approximately 11:59 AM, ELDRED made an outgoing call to (401) 263-9349 from TT1 (Session 4736). The user of this phone has not yet been identified and will be referred to as UM9349. The following conversation occurred between ELDRED and UM9349:

**UM9349**: *Yo buddy I didn't forget [unintelligible] didn't answer the phone yet, theyre probably sleeping.*

**ELDRED**: *Alright*

**UM9349**: *Im on it.*

271.    During this call I believe ELDRED is calling another person who has access to the pill supplier to get the pills and the UM9349 is saying they are probably still sleeping which is why they aren't answering their phone.

272.    At approximately 12:07 PM, at my direction, CW-1 placed a consensually monitored and recorded call to TT1 (Session 4772). During the call the following conversation occurred:

**ELDRED**: Yo

**CW-1**: Yo

**ELDRED**: Yeah Im just waiting for him to call me, he said he was counting it already. Im just waiting for him call me to pull up.

**CW-1**: Alright yeah

**ELDRED**: Alright

**CW-1**: Alright just hit me up, ill be around a while for it

**ELDRED**: Nah I got you, you know that.

273.    At approximately 12:18 PM, ELDRED placed an outgoing call to (401) 346-2980 from TT1 (Session 4787). The user of this number has not yet been identified and will be referred to as UM2980. The following is a transcription of the call:

**UM2980**: *Yo*

**ELDRED**: *Yo*

**UM2980**: *I was just calling you*

**ELDRED**: *Yeah I know my phone died as soon as you was calling. Yo I was going to ask you, um im looking for the blue smurfs*

**UM2980**: *Somebody else just hit me up for those too. Uhh how much you want?*

**ELDRED**: *A rack*

**UM2980**: *Damn, how much you trynna pay? A pop?*

**ELDRED**: *like 2 or 2's a pill*

**UM2980**: *Let me make a call, what kind you want? Cuz this shit be all different*

**ELDRED**: *Nigga I don't give a fuck bro. M's D's, I don't give a fuck*

**UM2980**: *Alright let me make a call*

**ELDRED**: *Alright.*

274.    Based on this call, I believe ELDRED called another supplier of pills. I believe this because when the UM2980 asked what kind ELDRED wanted, ELDRED referred to M's or D's referencing the stamp on the pill, to appear as though it is counterfeit oxycodone or Xanax, which I know drug dealers commonly refer to as "D's".

275.    At approximately 12:22 PM, ELDRED received an incoming call from (401) 286-4659 to TT1 (Session 4797). The user of this number has not been identified and will be referred to as UM4659. During the call ELDRED asks UM4659 where "Carlos is at" and states that he "needs him". The UM4659 agrees to try and get into contact with "Carlos" and the call ends.

276.    At approximately 12:24 PM, ELDRED received an incoming call to TT1 from the 4334 number (Session 4802), this call was not monitored due to a system malfunction. Your affiant has now learned that this number belongs to CARLOS RODRIGUEZ.

277.    At approximately 12:26 PM, ELDRED sent a text message from TT1 to the CW-1 stating, "*On phone with him*" (Session 4803). I understand this to mean ELDRED is on the phone with the supplier.

278.    At approximately 12:27 PM, ELDRED sent a text message from TT1 to the CW-1 stating, "*Im have meet me in 15 minutes*" (Session 4804). I understand this to mean ELDRED is going to have the supplier meet him in 15 minutes.

279.    At approximately 12:28 PM, ELDRED received a text message to TT1 from the CW-1, at my direction, stating "Ok just lmk where to go" (Session 4805).

280.    At approximately 12:47 PM, ELDRED made an outgoing call to the CW-1 from TT1 (Session 4819). The call was not answered by the CW-1 at my direction. ELDRED made a second attempt to call the CW-1 back from TT1 (Session 4825). During the call, ELDRED tells the CW-1 that they are going to go meet the supplier together and they will jump in either ELDRED truck or CW-1's vehicle. ELDRED agrees to go in the CW-1's vehicle and the call abruptly ends.

281.    At approximately 12:51 PM, ELDRED made an outgoing call to the CW-1 from TT1 (Session 4828). The call was answered at my direction. During the call ELDRED and CW-1

discuss a location to meet. The two agree to meet by the Marriott Downtown and then agree to go into ELDRED's vehicle. Based on this call I know this location to be 32 Exchange Terrace, Providence, Rhode Island.

282.    At approximately 1:03 PM, myself and another member of law enforcement searched the CW-1's person and vehicle for any narcotics or unexplained amounts of money with negative results. I provided the CW-1 with an audio and video recording device and $4,250 of OAF.

283.    At approximately 1:05 PM, ELDRED was observed by members of surveillance operating his Dodge Ram and arriving at 21 Orms Street, Providence, Rhode Island. This location is also a Marriott located in Providence.

284.    The CW-1 was continuously surveilled by members of law enforcement to the Marriott where he parked his car on the side of the road. At approximately 1:07 PM, the CW-1 sent a text message to ELDRED on TT1 (Session 4838) and stated, "*Pulling up*".

285.    At approximately 1:09 PM, ELDRED placed an outgoing call from TT1 to CW-1 (Session 4839). This call was monitored by agents in the wire room. During the call CW-1 explained to ELDRED that he is at the wrong Marriott and ELDRED agrees to meet the CW-1 at the Marriott Downtown, across the street from Kennedy Plaza. Simultaneously members of surveillance observe ELDRED depart the Orms Street location and begin to drive toward the Exchange Terrace location.

286.    At approximately 1:11 PM, I observed ELDRED arrived at the Marriott on Exchange Terrace and park next to the CW-1's vehicle. The CW-1 then exited his vehicle and entered into ELDRED's vehicle and ELDRED drove away.

287.    After being continuously surveilled, at approximately 1:16 PM, ELDRED was observed parking at the corner of Empire Street and Westminster Street in Providence, Rhode Island. ELDRED was then observed exiting the vehicle and walking toward the Social Security building in Downtown Providence, leaving the CW-1 in the vehicle. During this time, members of law enforcement observed an older white male in the vehicle with the CW-1. The male was later identified by the CW-1 as ELDRED's father.

288.    At approximately 1:31 PM, members of law enforcement observed a Nissan SUV bearing 1QN242 park in front of the Dodge Ram, and the mother to ELDRED's children exited her vehicle and approached the Dodge Ram. She then left and was not surveilled. The CW-1 later stated that ELDRED had given his father money to give to her.

289.    At approximately 1:43 PM, EDLRED was observed returning to his truck and enter the vehicle by members of law enforcement. ELDRED then departed the location and was surveilled by law enforcement.

290.    At approximately 1:46 PM, EDLRED placed an outgoing call to the 4334 number from TT1 (Session 4860). The following is a transcription of the call:

**RODRIGUEZ**: *Yo*

**ELDRED**: *Yo, How we lookin im going to Pawtucket to give my brother these keys for the shop real quick and then Ill come back to Prov.*

**RODRIGUEZ**: *Nah shes about to be, shes about to be on her way and shit. That's where I gotta go too no cap. Pawtucket and shit*

**ELDRED**: *Dale then nigga*

**RODRIGUEZ**: *I don't know if you want to meet around there or what?*

**ELDRED**: *Yeah*

**RODRIGUEZ**: *[Overlapping] fuckin my mom about to be here, once she be here Im out*

**ELDRED**: *Yeah so once she come dale*

**RODRIGUEZ**: *Yeah Ima call you no cap*

**ELDRED**: *Alright*

291.    Based off this call, I believe that ELDRED's pill supplier is RODRIGUEZ. I believe this because ELDRED is telling him that he can meet him back in Providence however they both agree to meet in Pawtucket, after RODRIGUEZ's mother gets there.

292.    At approximately 1:53 PM, ELDRED is surveilled to the TARGET PREMISES 5. I know this location to be the location of ELDRED's "Garage."

293.    At approximately 2:03 PM, ELDRED, the CW-1, and ELDRED's father re-enter the Dodge Ram and depart from the TARGET PREMISES 5 and drive to Oliveira's Liquor located at 610 Main Street, Pawtucket, Rhode Island. I observed ELDRED and his father exit the vehicle and enter the convenience store.

294.    At approximately 2:06 PM, I observed ELDRED, and his father exited the store and returned to their vehicle, they both entered the vehicle and drove away and were surveilled back to the TARGET PREMISES 5 at 2:15 PM. It should be noted members of surveillance momentarily lost visual contact of ELDRED's truck, but it was no longer than 2-3 minutes.

295.    At approximately 2:33 PM, I observed ELDRED and CW-1 leaving in ELDRED's Ram truck from the TARGET PREMISES 5 and took a left out of the lot. The vehicle travelled away at a high rate of speed and members of law enforcement were unable to locate ELDRED and temporarily lost visual contact.

296.    At approximately 2:50 PM, ELDRED received an incoming call from the 4334 number to TT1 (Session 4873). The following is a transcription of the call:

**ELDRED**: *Yeah Im ordering uh uh uh a sandwich right here*

**RODRIGUEZ**: *Oh alright, Im right here*

**ELDRED**: *Alright*

297.    I understand this call to mean that ELDRED is currently ordering a sandwich and his supplier for the pills is stating he is right there. Simultaneously, I received an ATIS Tower ping which showed that ELDRED was in the vicinity of D'Angelo Grilled Sandwiches ("D'Angelo's"), located at 216 Broadway, Pawtucket, Rhode Island. All members of surveillance team initiated surveillance at this location.

298.    At approximately 2:51 PM, a member of law enforcement observed ELDRED's vehicle with the CW-1 inside of it in the parking lot of D'Angelo's.

299.    At approximately 2:52 PM, ELDRED was observed meeting with a dark colored Toyota Camry with temporary registration. ELDRED was then observed walking away from the vehicle and re-entered D'Angelo's. Simultaneously, the Toyota Camry backed out of the parking lot and drove away at a high rate of speed. A member of law enforcement attempted to catch up to the vehicle, however due to traffic, safety, and the rate of speed the vehicle travelled, they were unable to get a license plate.

300.    At approximately 2:54 PM, ELDRED was observed exiting D'Angelo's and travelled away and got on interstate 95 southbound. ELDRED was surveilled till he dropped off the CW-1 back at his vehicle where I observed them arrive at approximately 3:31 PM. It should be noted that surveillance was momentarily suspended due to ELDRED employing multiple counter-surveillance techniques and mentioning to the CW-1 of a vehicle that he believed was following him that belonged to a member of law enforcement. This was mentioned to the CW-1

while CW-1 was in the vehicle and was also captured on the audio and video recording device that was consensually placed on the CW-1's person.

301.    CW-1 was then surveilled to a pre-determined meeting location where he arrived at 3:45 PM. At the pre-determined meeting location, the CW-1 provided me with the audio and video recording device and 2 large clear plastic baggies containing blue pills, which I know to have the look feel and texture of counterfeit M30 oxycodone pills. The CW-1 was searched for any narcotics or money with negative results.

302.    A field test of the suspected counterfeit M30 Oxycodone pills yielded a positive result for the presence of fentanyl.

303.    I took a gross weight of the suspected fentanyl pills which yielded a gross weight of approximately 147.65 grams. The narcotics were then heat sealed and sent to the DEA Northeast Laboratory for further testing.

304.    The CW-1 was debriefed and provided that during the controlled purchase it was as though ELDRED had a lot of errands to run and took the CW-1 along for the ride. CW-1 confirmed that the male in the blue Toyota was in fact the person that supplied ELDRED with the 1,000 fentanyl pills. Furthermore, the CW-1 stated that it appeared as through ELDRED bought an extra 500 pills for himself as well.

305.    I reviewed the audio and video from the device given to the CW-1 and verified that ELDRED was in fact the person that physically gave the CW-1 the 1,000 pills for $4,250.

306.    Law enforcement database checks through TRAC[13], show the 4334 number to be associated with a CARLOS RODRIGUEZ, date of birth 1/12/1996. Members of law

---

[13] TRAC, is a law enforcement database which is a Transaction Record Analysis Center and records information provided through Western Union money transfers and Cryto-transfers. This system provides who the information on the senders and receives and typically assists in money laundering investigation.

enforcement retrieved video footage from across the street of the controlled purchase location which shows the vehicle that ELDRED met with to be a dark colored Toyota Camry which departed at a high rate of speed. Additionally a member of law enforcement observed the vehicle to have a temporary registration.

307.    On November 27, 2023, myself and another member of law enforcement met with CW-1 to conduct a controlled purchase of 500 fentanyl pills for $2,250 from ELDRED. It should be noted for the entirety of this controlled purchase, I verified by visually observed that CW-1 placed either a phone call or text message to the number for TT1 and verified through tolls for each and every occasion.

308.    At approximately 2:25 PM, an outgoing call from the CW-1 to the TT1 was placed but the call was not answered.

309.    At approximately 2:26 PM, the CW-1 received an incoming call from ELDRED from TT1 (Session 10718), during the call the following conversation occurs related to narcotic trafficking:

CW-1: You busy?

ELDRED: Nah why what's up?

CW-1: I was trying fucking my people wanna see if they can grab 500 of them

ELDRED: 500?

CW-1: I know its kinda off like usually I let you know a day ahead of time. Shit came outta nowhere

ELDRED: Yea let me um let me call my people see if they around

CW-1: Alright

ELDRED: Alright. What you down here already?

**CW-1**: Naw I'm close though I'm in my boys crib in Warwick.

**ELDRED**: Alright alright alright

**CW-1**: [Unintelligible]

**ELDRED**: Alright let me call them and see what's up

**CW-1**: Alright

310. Based on this call, I believed that ELDRED was going to make a call to his supplier to order the 500 pills for CW-1.

311. At approximately 2:29 PM, ELDRED made an outgoing call the 4334 number (Session 10721) which is believed to be utilized by RODRIGUEZ. The call has no audio or content. However, based on information learned in this investigation, it is believed that either this was a facetime audio call or the call was not answered and was communicated through iMessage, or another secured application, which cannot be intercepted by the Title III monitoring system.

312. At approximately 2:39 PM, ELDRED received an incoming call from the 4334 number (Session 10723). The call was not answered, and there was not a recording or audio detected by the Title III monitoring system.

313. At approximately 2:42 PM, the CW-1 received a text message from ELDRED on TT1 (Session 10726, 10727) stating, *"Yea" and "2250."* Your affiant believes that ELDRED confirmed the order of the 500 fentanyl pills for 2260 with CW-1.

314. At my direction CW-1 responded to ELDRED on TT1 and confirmed the deal and agreed to meet around 4 PM. CW-1 asked for the meeting location from ELDRED but did not get a response.

315.    At approximately 4:10 PM, 4:11 PM, and 4:36 PM, ELDRED placed two outgoing calls to the 4334 number (Session 10760, 10761, 10780). However, the calls were not answered and no audio was recorded.

316.    At approximately 4:38 PM, CW-1 received a call from ELDRED on TT1 (Session 10783). The following conversation occurred:

**CW-1**: Yo.

**ELDRED**: Yo

**CW-1**: Yeah.

**ELDRED**: What's up

**CW-1**: Chilling over here near fucking the McDonald's and shit on Broad.

**ELDRED**: Alright yup I'm right in the park.

**CW-1**: Oh [UI] where at in the park.

**ELDRED**: Ah where the park's at. Carousel and the park.

**CW-1**: Alright, fucking I'm just, I'm just grabbing them right? We don't, we don't gotta to take a ride or nothing right?

**ELDRED**: Nah, he's about to pull up right now. I was just making sure you where you was.

**CW-1**: Alright.

**ELDRED**: Nah I got my kids bro. I'm not--

**CW-1**: Alright, hell yeah I'm coming. I'm not even three minutes away.

**ELDRED**: [Unintelligible]

317.    Based on this call, I believe that ELDRED's supplier was going to show up at the park and deliver the pills to ELDRED. It should be noted that ELDRED GPS pings for TT1 showed the telephone to be located near the carousel in Roger Williams Park.

318.    At approximately 4:40 PM, a member of law enforcement observed ELDRED, walking by the carousel in Roger Williams Park with two children.

319.    At approximately 4:45 PM, ELDRED placed an outgoing call to the 4334 number (Session 10787). However, the call was not answered, and no audio was recorded.

320.    At approximately 4:47 PM, the CW-1 and ELDRED exchanged the following text messages:

**CW-1** (Session 10788): Grabbing gas real quick fam I'm close anyways I forgot to put it urlier

**ELDRED** (Session 10789): *Take ur time*

**ELDRED** (Session 10790): *He said gps said 23 mins*

**ELDRED** (Session 10791): *He said he got him on him. He's just in traffic on the way here.*

**ELDRED** (Session 10792): *But I'm here at the park with the kids*

**CW-1** (Session 10794) *Dam ight then I'll be there but 23 mins 100%*

321.    Based on this text message exchange, your affiant believes that the supplier for the narcotics will be at the park in 23 minutes.

322.    At approximately 4:53 PM, a member of law enforcement observed ELDRED walking up toward a hill out of view. Based on the lighting conditions and there not being a lot of lights in the Roger Williams Park at night, members of law enforcement lost visual contact with ELDRED and could not locate him inside of the park.

323.    At approximately 5:11 PM, the CW-1 sent an outgoing text message to ELDRED on TT1 (Session 10806) stating *"Is you boy there I'm just trying to grab and go because this fat bitch is bitching about I'm playing lol."*

324.    Simultaneously, ELDRED made an outgoing call to the 4334 number (Session 10807), which lasted approximately 24 seconds, however there was no audio recording on the Title III monitoring system.

325.    At approximately 5:13 PM, ELDRED sent an outgoing text message from TT1 to the CW-1 (Session 10809) stating, "Pull up he said now."

326.    Based on the calls and information, I believe that ELDRED spoke to the supplier, who I believe to be RODRIGUEZ on the 4334 number, however they spoke on an application that is captured through tolls, but audio was not able to be captured by the Title III monitoring system indicating they might have communicated via iMessage or Facetime Audio.

327.    In anticipation of a controlled purchase, and following the details outlined above with the controlled purchase, CW-1 was provided $2,260[14] of OAF and an audio and video recording device. CW-1 was instructed to go toward the Roger Williams Park and conduct the controlled purchase of 500 pills for $2,260 with ELDRED.

328.    At approximately 5:19 PM, as the CW-1 was getting ready to depart the pre-determined meeting location, he received a text message from ELDRED on TT1 telling him to "Go to Olympic Pizza" (Session 10815). I know this location to be located at 1323 Broad Street, Providence, Rhode Island.

329.    In anticipation of a controlled purchase taking place at this location, members of law enforcement set up surveillance at this location.

---

[14] Although CW-1 was quoted $2,250 for the 500 fentanyl pills, the government did not have change in Government Funds to make $2,250, therefore CW-1 was instructed to give ELDRED $2,260 and explain that the extra $10 was for a pack of cigarettes.

330.    After being continuously surveilled from the pre-determined meeting location, the CW-1 arrived at 1323 Broad Street and parked directly next to the restaurant on Fisk Street in Providence, Rhode Island.

331.    At approximately 5:55 PM, a member of law enforcement observed ELDRED walking from the area of the shopping center just north of Fisk Street and Broad Street. ELDRED's vehicle was also observed parked across the street from this location at a Taco Bell parking lot, located at 1304 Broad Street, Providence, Rhode Island. Law enforcement lost visual contact of ELDRED due to the lighting conditions in the area.

332.    At approximately 3:06 PM, a member of law enforcement observed ELDRED as he was walking from the shopping center north of Fisk Street, ELDRED entered the front door of the Laundromax, located at 1315 Broad Street, Providence, Rhode Island, and immediately exited a side door and entered the passenger side of the CW-1's vehicle.

333.    At approximately 6:09 PM, a member of law enforcement observed ELDRED as he exited the passenger side of the CW-1's vehicle and walked back out the way he came, additionally after exiting the Laundromax, a member of law enforcement observed ELDRED as he entered the Mega Mezcla Record Shop ("the record shop")_.

334.    At approximately 6:18 PM, a member of law enforcement observed ELDRED exit the record shop  and walk away toward a vehicle where his children were. ELDRED was observed getting into the vehicle and was surveilled away from the area where members of surveillance were unable to follow him due to the vehicle, he was in travelling away at a high rate of speed.

335.    CW-1 was surveilled from the controlled purchase location directly to the pre-determined meeting location where he arrived at approximately 6:25 PM. At the pre-determined

meeting location, the CW-1 provided me and the audio and video recorder as well as a small

plastic baggie which contained blue pills consistent with the look and feel as counterfeit M30

oxycodone pill, laced with fentanyl. The CW-1 and his vehicle were searched for any narcotics

and money with negative results.

336.    At the pre-determined meeting location, CW-1 explained that when he arrived at

the pre-determined meeting location, he texted ELDRED and told him that he had arrived, after

waiting for a while, he called ELDRED who told him that he was walking down. A short while

later, ELDRED entered the front passenger seat. While in the vehicle, ELDRED exchanged the

baggie of pills for the $2,260 and explained there was 10 extra dollars for a pack of cigarettes.

ELDRED explained to the CW-1 that he has been stressed recently. After exiting the vehicle,

ELDRED walked into the side door of the laundromat and the CW-1 departed the location and

went to the pre-determined meeting location.

337.    On Tuesday November 28, 2023, the members of law enforcement conducted

surveillance at the record shop.  At approximately 2:27 PM, a member of law enforcement

located the **Dark Colored Toyota Camry bearing Rhode Island registration: DP-491**[15],

parked directly in front of the record shop. The Camry is the suspected vehicle for the person

who supplied COTY ELDRED with fentanyl pills on October 31, 2023, and November 27, 2023,

based on information learned about RODRIGUEZ and discovering that on November 2, 2023,

RODRIGUEZ was stopped in a dark colored Toyota Camry bearing the Maryland temporary

registration: F99756R9. Your affiant believes that the vehicle RODRIGUEZ was stopped in on

November 2, 2023, is the Camry, which also had the same temporary registration during the

---

[15] NCIC database checks show this vehicle to be registered to CARLOS E. RODRIGUEZ, Date of Birth (DOB):
01/12/1996, Address: 427 Carter Avenue, Pawtucket, Rhode Island for a 2008 grey Honda with a cancelled
registration.

October 31, 2023 controlled purchase, which now has the incorrect registration of DP491 on the Camry.

338.    At approximately 2:43 PM, a member of law enforcement observed and identified a person matching the physical description of RODRIGUEZ, wearing a black hat, gold chain, black pants, and a grey hooded sweatshirt. RODRIGUEZ was observed walking in and out of the location and of the black Toyota Camry.

339.    At approximately 5:06 PM, a member of law enforcement observes the Toyota and a black Audi SUV bearing the Rhode Island registration: 1RT596, depart the location and the members of surveillance initiate surveillance on the vehicle.

340.    At approximately 5:12 PM, a member of law enforcement observed the vehicle park next to an RV off Overhead Way, Warwick, Rhode Island. The address for this location is 47 Manson Avenue, Warwick, Rhode Island.

341.    At my direction, members of law enforcement contacted the Warwick Police Department to conduct an identification traffic stop on both the Audi SUV and the Toyota Camry.

342.    At approximately 5:57 PM, a member of law enforcement observed both vehicles departing from 47 Manson Avenue, Warwick, Rhode Island and travelling down Pawtuxet Avenue, Warwick, Rhode Island.

343.    At approximately 6:00 PM, the marked Warwick Police Department initiated the traffic stops on the Camry and Audi. The Camry pulled over to the side of the road and the Audi was pulled over, however when the officer exited his vehicle, the driver of the Audi fled.

344.    At the conclusion of the traffic stop, at approximately 6:30 PM, the patrol officers notified me that the subject in the Toyota Camry was identified as CARLOS RODRIGUEZ,

DOB: 1/12/1996. Additionally, they stated that he had 3 cellular devices on his person and was actively facetiming an unknown female when he was pulled over.

345.    At approximately 6:36 PM, the Cranston Police Department located the black Audi at 106 Edgewood Avenue, Providence, Rhode Island parked in the driveway. Once members of the Cranston Police Department drove around the block the vehicle was then parked on the street and locked and no one was located inside of the vehicle. A canvass of the neighborhood revealed that the vehicle, does not belong at the residence and the neighbors were unsure who drove the vehicle or why it was there. They further stated that the resident of 106 Edgewood was not at the residence and there shouldn't have been anyone in the driveway to their knowledge.

346.    The vehicle was towed by the Cranston Police Department and the registered owner of the vehicle will be issued a summons for Reckless Eluding.

347.    Surveillance regarding this incident was terminated.

348.    On Wednesday, November 29, 2023, surveillance was conducted at the record shop.

349.    At approximately 4:36 PM, a member of law enforcement observed the Toyota Camry belonging to RODRIGUEZ parked directly in front of the record shop.

350.    At approximately 5:40 PM, a member of law enforcement observed and identified RODRIGUEZ wearing a black jacket walking around the inside of the shop.

351.    At approximately 5:48 PM, a member of law enforcement observed RODRIGUEZ take a seat directly in view from the exterior of the building by the front door with a cellular telephone in his hand.

352.    Simultaneously, your affiant placed an outgoing call to (401) 499-4334. The call lasted for approximately 1 minute. During the call, I utilized a fictitious name of "Johnny" and asked if the person was Carlos, which he identified himself as "Charlie." I inquired about the "P's" from the user of the 4334 number, which I know to be slang for Percocet, to which the user of the 4334 number questioned your affiant how he obtained his number. I stated he received the number from "Marky" who told him he could get the P's from the user of the 4334 number. The user of the 4334 number stated he doesn't fuck with the P's but could assist your affiant if he did not call on a private number. I told the user of the 4334 number that he would get a burner number because I did not want to talk to the 4334 number over my normal number which is why I blocked it. The user of the 4334 number said, "okay" and the call was ended.

353.    It should be noted that during the time of the call, a member of law enforcement observed RODRIGUEZ answer the cell phone. RODRIGUEZ removed the phone from his pocket and put it up to his left ear and had the conversation for the duration of time your affiant and RODRIGUEZ were speaking. Additionally, a member of law enforcement captured photographs of RODRIGUEZ on the phone at the time of the phone call.

354.    At approximately 6:49 PM, a member of law enforcement advised that it appeared as though RODRIGUEZ, and other unknown parties were closing the record shop.

355.    At approximately 6:51 PM, a member of law enforcement observed RODRIGUEZ enter the CAMRY and depart from the store front and was continuously surveilled until approximately 7:07 PM, where surveillance lost contact with the vehicle due to heavy traffic on interstate 95 north near the Providence Place Mall.

356.    At approximately 7:43 PM, a member of law enforcement, who has previously investigated RODRIGUEZ, conducted an address check that was related to RODRIGUEZ in a

separate investigation, where he lived at the TARGET PREMISES 10. During the check at the

TARGET PREMISES 10, the member of law enforcement observed the CAMRY parked in the

parking lot.

357.    On December 1, 2023, members of law enforcement conducted surveillance at the

TARGET PREMISES 10.

358.    At approximately 6:00 AM, a member of law enforcement observed the CAMRY

parked in the parking lot of the TARGET PREMISES 10.

359.    At approximately 9:36 AM, pole camera mounted and viewing the parking lot and

back deck of the TARGET PREMISES 10, captured RODRIGUEZ exiting the area from the

TARGET PREMISES 10.

360.    On December 3, 2023, at my direction and the direction of another member of law

enforcement, members of the Pawtucket Police Department, knocked at various residences in the

vicinity of the TARGET PREMISES 10, to inform the residents of recent criminal activity in the

neighborhood. At which point, the uniformed officer, who was made aware of the identity of

RODRIGUEZ prior to going to the TARGET PREMISES 10 came into contact with

RODRIGUEZ in a common area of 294/298/276 Pawtucket Avenue, Pawtucket, Rhode Island.

The officer spoke to RODRIGUEZ who explained that he lived in the building and lived in

apartment 6. The officer was able to speak to RODRIGUEZ as he entered the door for apartment

6 and continued speaking with him regarding the recent crime in the area. Based on this

interaction, your affiant believed RODRIGUEZ lives in apartment 6 of either 294/298/276

Pawtucket Avenue, Pawtucket, Rhode Island. It should be noted that on the entire building all

three address numbers are listed on the building. In the Attachment A of the supporting

document, a photograph of the specific door RODRIGUEZ is believed to be the resident of will

be attached. Additionally, the Camry was observed by law enforcement to be parked in the

parking lot of the TARGET PREMISES 10 at the time of the conversation between the police

officer and RODRIGUEZ.

361.    Members of law enforcement conducted multiple checks to locate and identify the

TARGET PREMISES 10 as the address which RODRIGUEZ occupies, the following is how law

enforcement has determined RODRIGUEZ lives at the TARGET PREMISES 10 and is believed

to keep proceeds of the criminal activity at the residence:

a.  The inquiry into the Camry indicated that the vehicle belonged to a different make

and model vehicle, specifically, a vehicle with the VIN: 1HGCP26858A088102.

A check in NCIC revealed that the VIN was now registered to the Rhode Island

license plate of 1DN-357, which shows the vehicle to be registered to CRISTAL

J. HERNANDEZ MONTANEZ, YOB: 2001, with an address of the TARGET

PREMISES 10.

b.  On Thursday, October 19, 2023, HERNANDEZ MONTANEZ was stopped by

the Rhode Island State Police for a motor vehicle violation, while operating a

2008 Honda Accord, bearing the license plate number of 1DN-357. During the

contact, MONTANEZ provided the TARGET PREMISES 10 as her address.

c.  On Thursday, July 20, 2023, the North Smithfield Police Department stopped the

same 2008 Honda Accord listed above with the license plate DP491, the same

license plate as the Camry. During the motor vehicle stop, MONTANEZ, was

driving the vehicle and the passenger was identified as RODRIGUEZ, who she

explained was her boyfriend.

Based on the above, I believe that the telephone used by RODRIGUEZ to communicate with

ELDRED will be located in TARGET PREMISES 10.

### *Digital Devices*[16] *and Request for Biometric Unlocking of Those Devices*

362.   Based on my training, experience, and information from those involved in the

forensic examination of digital devices, I know that the following electronic evidence, inter alia,

is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months
or even years after the files have been downloaded, deleted, or viewed via the
Internet.  Normally, when a person deletes a file on a computer, the data
contained in the file does not disappear; rather, the data remain on the hard drive
until overwritten by new data, which may only occur after a long period of time.
Similarly, files viewed on the Internet are often automatically downloaded into a
temporary directory or cache that are only overwritten as they are replaced with
more recently downloaded or viewed content and may also be recoverable months
or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's
user, or the existence of evidence in other locations, such as how the device has
been used, what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents, programs,
applications, and materials on the device.  That evidence is often stored in logs
and other artifacts that are not kept in places where the user stores files, and in
places where the user may be unaware of them.  For example, recoverable data
can include evidence of deleted or edited files; recently used tasks and processes;

---

[16] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing
data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones;
digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors,
and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and
security devices.

online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

363. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during execution of a search warrant for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

364.   Based upon my involvement and the involvement of other agents in this investigation, I know that drug traffickers regularly communicate using cellular telephones, which has been confirmed in this case through the use of pen registers and toll analysis, some of which is described herein.

365.   The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.   I know from my training and experience, as well as information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.      If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device though his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.      As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers,

that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.      In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.      Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of

the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### Conclusion

366.    As stated above, in paragraph 31, DURE uses other communication applications and another telephone line, it was learned through an intercepiton on December 5, 2023, that one of ELDRED's suppliers will not speak on the phone about narcotics and requires everything to be done in person.

367.    Based on the above, I suggest that there is probable cause to search the people, premises, and vehicles identified in Attachments A-1 through A-15, for the evidence described in Attachments B-1 through B-15. I also believe there is probable cause to arrest RODRIGUEZ.

J. Carlos Razon
Special Agent
Federal Bureau of Investigation

SWORN BEFORE ME AND IN MY PRESENCE

Attested to by the Applicant/Affiant in accordance with the requiement of Fed. R. Crim. P. 4.1 in person.

_____

UNITED STATES MAGISTRATE JUDGE
LINCOLN D. ALMOND

_Providence RI_
City and State

_12/06/2023_
Date:

## Attachment A-1

### Premises to be Searched

**MARC DURE's** ("DURE") residence located at 18 Tecumseh Street, Apartment 4, Providence, Rhode Island ("TARGET PREMISES 1"), described as a multi-family apartment complex with four listed apartments with a fenced in front yard surrounding the residence. The exterior of the residence is painted white and brown with white accents. The front common area door is white with a large glass window with the number "18" above the door. To the left of the door is four mailboxes and four doorbell's each with the numbers 1 through 4 indicating there are four apartments.

Apartment 4 is on the second floor and to the left of the building as viewed from the street.

Entry is made though a common doorway.

 

**ATTACHMENT B-1**

**Particular Things to be Seized (TARGET PREMISES 1)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to MARC DURE (DURE) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

        f)      Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

        g)      Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

        h)      TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of DURE or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to- talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to DURE

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)    Keys to a Hyundai Sonata vehicle and to the TARGET PREMISES 1 described in Attachment A-1.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

      i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

      ii.   Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

      iii.  Any incoming/outgoing text messages relating to the above criminal violations;

      iv.   Telephone subscriber information;

      v.    The telephone numbers stored in the cellular telephone and/or PDA;

vi.    Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access

data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

**Attachment A-2**

Vehicle to be Search

**MARC DURE's** white 2015 Hyundai Sonata ("TARGET VEHICLE 1"), Rhode Island

registration 1IW608, VIN: 5NPE34AB8FH157100, MARC A DURE; Date of Birth: 1/7/1994; Resident

Address: 12 Rankin Avenue, Providence, Rhode Island; Mailing Address: 35 East Drive, Apartment 2B,

Providence, Rhode Island.



**ATTACHMENT B-2**

**Particular Things to be Seized (TARGET VEHICLE 1)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000, and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to MARC DURE (DURE) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

   f) Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

   g) Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   h) TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of DURE; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to DURE

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)     Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to a Hyndai Sonata vehicle.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1.  evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5.  evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6.  evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7.  evidence of programs (and associated data) that are designed to eliminate data from the device;

8.  evidence of the times the device was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.   Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.  Any incoming/outgoing text messages relating to the above criminal violations;

    iv.   Telephone subscriber information;

    v.    The telephone numbers stored in the cellular telephone and/or PDA;

    vi.   Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.   Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

    g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

    h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## Attachment A-3

### Premises to be Searched

**MARC DURE's** mailing address at 35 East Drive, Apartment 2B, Providence, Rhode Island ("TARGET PREMISES 2"), which is described as a muti-family apartment building within the Sutterfield Apartment Complex. The building is on a hill which is in between Phebe Street and East Drive. The exterior of the apartment is painted white and light brown with white accents. There is a common area door on the exterior of the building which leads to the unit apartments.  The Door is designated with the blue arrow in the second photo below.  Apartment 2B is accesses by a stairwell beyond the common doorway which leads to the second floor.





## ATTACHMENT B-3

### Particular Things to be Seized (TARGET PREMISES 2)

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to MARC DURE (DURE) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

      f)    Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

      g)    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      h)    TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of DURE; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)     Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)     STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)     Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to DURE

l)     Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)    Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)     Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)     Contents of any calendar or date book;

p)     Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)     Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)     Firearms.

        s)     Keys to a Hyundai Sonata vehicle and to the TARGET PREMISES 2

described in Attachment A-3.

With respect to any digital device containing evidence falling within the scope of the foregoing

categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i.     Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.   Any incoming/outgoing text messages relating to the above criminal violations;

    iv.   Telephone subscriber information;

v.    The telephone numbers stored in the cellular telephone and/or PDA;

vi.   Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.  Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.     The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.     After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

### ATTACHMENT A-4

Premises to be Searched

**MARC DURE's** secondary address at 12 Rankin Avenue, Providence, Rhode Island ("TARGET PREMISES 3"), is described as a 1582 square foot single family home, with 5 bedrooms and 2 bathrooms and a detached garage. The exterior of the home is painted light blue with white accents. The perimeter of the property has a white picket fence with a driveway to the right side of the residence, which leads to the detached garage. The front door is white, with a clear screen door in front of it and a mailbox to the left of the door. There are 4 steps that lead from the sidewalk to the front door. To the left of the door on the door frame is the number "12."





**ATTACHMENT B-4**

**Particular Things to be Seized (TARGET PREMISES 3)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)    Any controlled substance, controlled substance analogue, or listed chemical;

b)    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)    FINANCIAL RECORDS: All financial records of or relating to MARC DURE (DURE) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

       f)    Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

       g)    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

       h)    TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of DURE; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i) Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j) STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k) Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to DURE

l) Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m) Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n) Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o) Contents of any calendar or date book;

p) Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q) Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r) Firearms.

        s)      Keys to a Hyndai Sonata vehicle and to the TARGET PREMISES 3 described in Attachment A-4.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1.  evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5.  evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6.  evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7.  evidence of programs (and associated data) that are designed to eliminate data from the device;

8.  evidence of the times the device was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

      i.      Telephone numbers of incoming/outgoing calls stored in the call registry;

      ii.     Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

      iii.    Any incoming/outgoing text messages relating to the above criminal violations;

      iv.    Telephone subscriber information;

v.    The telephone numbers stored in the cellular telephone and/or PDA;

vi.    Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

   g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

   h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-5

### Premises to be Searched

**COTY ELDRED's** ("ELDRED") residence at 1119 Douglas Avenue, Apartment 15, North Providence, Rhode Island ("TARGET PREMISES 4"). The building is described as a large, restored mill, converted to house approximately 20 apartment units into multiple buildings along the property. Apartment 15 is located inside of an entrance, labeled "building 3" and is located on the first floor of the 1119 building 3.   Due to limited access to the building, a description of apartment 15 is not readily available. The entrance to building 3 of 1119 Douglas is a large steel brown door with the number "1119" on the front of the door. Building 3 is designated with the red pin in the photo to the right below.

 

**ATTACHMENT B-5**

**Particular Things to be Seized (TARGET PREMISES 4)**

The items to be seized are evidence, contraband, fruits, or instrumentalities

of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and

conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)     Any controlled substance, controlled substance analogue, or listed

chemical;

b)     Items and paraphernalia for the manufacturing, distributing, packaging, sale,

or weighing of controlled substances, including scales and other weighing devices, plastic baggies,

food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and

money counters;

c)     Items used in the packaging of currency for consolidation and

transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands,

duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)     United States currency over $1,000 or bearer instruments worth over

$1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and

bonds) (including the first $1,000), and data, records, documents, or information (including

electronic mail, messages over applications and social media, and photographs) pertaining to,

obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank

account records, cryptocurrency records and accounts;

e)     FINANCIAL RECORDS: All financial records of or relating to COTY

ELDRED (ELDRED) and his nominees, assignees, or co-conspirators, including but not limited to

financial statements, balance sheets, income statements, cash flow statements, ledgers, journals,

accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items,

checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

       f)     Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

       g)     Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

       h)     TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of ELDRED; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to ELDRED

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to TARGET PREMISES 4 described in Attachment A-5.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

      b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.      If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

        g.      The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

        h.      After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-6

### Premises to be Searched

**COTY ELDRED's** garage at 143 Mineral Spring Avenue, Garage / Basement, Pawtucket,

Rhode Island ("TARGET PREMISES 5"). The garage is described as detached garage in the rear of

143 Mineral Spring Avenue. The exterior of the garage is colored beige with white siding, and a red

garage door with multiple window. To access the garage, there are driveways and parking lots on

either side of 143 Mineral Spring Avenue's structure.





**ATTACHMENT B-6**

**Particular Things to be Seized (TARGET PREMISES 5)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to COTY ELDRED (ELDRED) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

   f)  Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

   g)  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   h)  TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of ELDRED; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to ELDRED

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to  TARGET PREMISES 5 described in Attachment A-6.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.    Any incoming/outgoing text messages relating to the above criminal violations;

    iv.    Telephone subscriber information;

    v.    The telephone numbers stored in the cellular telephone and/or PDA;

    vi.    Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.      The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.      If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.      The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.      After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-7

### Premises to be Searched

**JOHN DAILEY's** ("DAILEY") residence at 86 Edgemere Avenue, Apartment 1, Providence, Rhode Island ("TARGET PREMISES 6"). The building is described as a 2 family, with a 1 bedroom 1 bathroom unit on the first floor and a 3 bedroom 1 bathroom on the 2nd floor. The exterior is painted grey with white accents, and a red brick foundation. The building has both a front and rear door and both are painted red. The driveway is accessed through Richland Street and encompasses the rear of the property. The property is surrounded by a wooden privacy fence around the perimeter. There are 7 steps from the sidewalk that provide access to the front door. To the right of the front door is the number "86" on the door frame. To the right of the door frame are two mailboxes.





**ATTACHMENT B-7**

**Particular Things to be Seized (TARGET PREMISES 6)**

      a)     Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

      b)     Keys to a Dodge Durango.

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the cellular device/telephone was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

    i.      Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.      Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.      Any incoming/outgoing text messages relating to the above criminal violations;

    iv.      Telephone subscriber information;

    v.      The telephone numbers stored in the cellular telephone and/or PDA;

    vi.      Records relating to the use, possession, and control of any cellular devices/ telephones seized;

    vii.      Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.     <u>SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE</u>

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    b.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.      The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a cellular device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular

device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.      The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.      After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-8

### Vehicle to be Searched

**JOHN DAILEY's** vehicle, a 2023 white Dodge Durango ("TARGET VEHICLE 2"), New York registration KBR3916, VIN: 1C4SDJCT2PC553752, registered to PV Holding CORP, mailing address: 23-45 87th Street, East Elmhurst, New York 11369.





## ATTACHMENT B-8

## Particular Things to be Seized (TARGET VEHICLE 2)

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)  Any controlled substance, controlled substance analogue, or listed chemical;

b)  Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)  Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)  United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)  FINANCIAL RECORDS: All financial records of or relating to JOHN DAILEY (DAILEY) and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks,

bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

       f)     Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

       g)     Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

       h)     TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of DAILEY; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to DAILEY

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to a DODGE vehicle.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

     vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.     If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.     The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.     After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-9

### Premises to be Searched

**CALVIN TAVAREZ's** ("TAVAREZ") residence at 8 Thomas Avenue, Apartment 1, first

floor, Pawtucket, Rhode Island ("TARGET PREMISES 7"). Described as a multi-family building on

a dead-end street. The exterior of the residence is painted brown with white accents and the

foundation is painted red. There is a driveway to the right side of the building. There are 3 doors on

the building, the front door, right side door, and rear door. The right-side door has 5 stairs from the

driveway which has two mailboxes on either side of it. To the left of the white door, the mailbox has

a number "1" and to the left of the door, the mailbox has the number "2." The front door has 5 stairs

that lead to the white door with no markings indicating the building number. The rear door has no

steps and appears to be access to the basement, from a shared backyard between units 1 and 2.

Access into Apartment 1 is made through the front door facing the street.



**ATTACHMENT B-9**

**Particular Things to be Seized (TARGET PREMISES 7)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)      Any controlled substance, controlled substance analogue, or listed chemical;

b)      Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c)      Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)      United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e)      FINANCIAL RECORDS: All financial records of or relating to CALVIN TAVAREZ and his nominees, assignees, or co-conspirators, including but not limited to financial statements, balance sheets, income statements, cash flow statements, ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets, deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks, official checks, bank

drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

      f)    Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

      g)    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      h)    TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of CALVIN TAVAREZ; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to CALVIN TAVAREZ

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to TARGET PREMISES 7 described in Attachment A-9.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

       b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

       i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

       ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

       c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

       d.     If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.     If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.      The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.      After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

**ATTACHMENT A-10**

**Person to be Searched**

**PEDRO FABERLLE**

PEDRO FABERLLE ("FABRELLE" OR "TARGET PERSON 1") is a black male, with black hair and brown eyes, approximately 5'11" and 190 lbs.  He appears to be in his mid-twenties.



## ATTACHMENT B-10

### Particular Things to be Seized (TARGET PERSON 1 FABERLLE)

a)      Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

b)      Any controlled substances or controlled substance analogue;

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1.  evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5.  evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6.  evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7.  evidence of programs (and associated data) that are designed to eliminate data from the device;

8.  evidence of the times the cellular device/telephone was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

    i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.    Any incoming/outgoing text messages relating to the above criminal violations;

    iv.    Telephone subscriber information;

    v.    The telephone numbers stored in the cellular telephone and/or PDA;

    vi.    Records relating to the use, possession, and control of any cellular devices/ telephones seized;

    vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.    <u>SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE</u>

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.  If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a cellular device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular

device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.       The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.       After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-11

### Premises to be Searched

**CHARLES LASSITER's** ("LASSITER") residence at 685 Charles Street, Apartment 1, Providence, Rhode Island ("TARGET PREMISES 8"). TARGET PREMISES 8 is located on the firsts floor. The building is described as a 3-family building. The exterior of the building is painted grey with white accents. From the sidewalk there is a series of stairs which leads to a red front door with the number "685" on a green placard to the right of the door. There is a second door to the right of the building that is white and has a walkway leading from the sidewalk on Charles Street and the parking lot in the rear. There are two mailboxes to the left of this door and one mailbox to the right. The parking lot for this building is accessed by a driveway which is accessed from Paul Street.

 



**ATTACHMENT B-11**

**Particular Things to be Seized (TARGET PREMISES 8)**

The items to be seized are evidence, contraband, fruits, or instrumentalities
of violations of Title 21, United States Code, Sections 841(a) (1) and 846 (drug trafficking and
conspiracy) (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

a)    Any controlled substance, controlled substance analogue, or listed
chemical;

b)    Items and paraphernalia for the manufacturing, distributing, packaging, sale,
or weighing of controlled substances, including scales and other weighing devices, plastic baggies,
food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and
money counters;

c)    Items used in the packaging of currency for consolidation and
transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands,
duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d)    United States currency over $1,000 or bearer instruments worth over
$1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and
bonds) (including the first $1,000), and data, records, documents, or information (including
electronic mail, messages over applications and social media, and photographs) pertaining to,
obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank
account records, cryptocurrency records and accounts;

e)    FINANCIAL RECORDS: All financial records of or relating to
CHARLES LASSITER (LASSITER) and his nominees, assignees, or co-conspirators, including
but not limited to financial statements, balance sheets, income statements, cash flow statements,
ledgers, journals, accounts receivable, accounts payable leases, bank statements, deposit tickets,
deposit items, checks, checkbooks, check registers, passbooks, money orders, cashier's checks,

official checks, bank drafts, wire transfer instructions and receipts, withdrawal slips, credit memos, debit memos, signature cards, account applications, automatic teller machine receipts, safe deposit box applications, safe deposit box keys, credit card statements, charge slips, receipts brokerage statements, buy and sell orders and other items evidencing the obtaining, secreting, transfer, or concealment of assets and the obtaining, secreting, transfer, concealment, or expenditure of money;

   f)  Items showing unexplained wealth or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, expensive vehicles, financial instruments, precious metals, jewelry, and real estate, and documents evidencing the procuring or leasing of these items;

   g)  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   h)  TRAVEL DOCUMENTS: All documents evidencing or relating to foreign or domestic travel of LASSITER; or his co-conspirators, including but not limited to airline tickets, tickets for other means of transport, credit card receipts, travel vouchers, hotel receipts, restaurant receipts, gas receipts, notes, schedules, other receipts evidencing travel, boarding passes, itineraries, luggage tags and receipts, frequent flyer statements and awards, car rental receipts and statements, photographs of travel locations, maps, written directions to a location, visas, passports, United States and foreign customs declaration receipts and forms;

i)      Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j)      STORAGE UNIT RECORDS: All records reflecting the ownership or control of storage units including keys, contracts, leases, payments, and inventories;

k)      Shipping records, to include any and all receipts (USPS, FedEx, UPS, and DHL) for parcels shipped to LASSITER

l)      Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

m)      Records, documents, programs, applications or materials, or evidence of the absence of same, including text, instant, and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

n)      Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

o)      Contents of any calendar or date book;

p)      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

q)      Any digital device (SEE BELOW- INCLUDING CELLULAR TELEPHONES AND TABLETS) which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

r)      Firearms.

s)      Keys to TARGET PREMISES 8 described in Attachment A-11.

With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the digital device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular phone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the digital device was accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the device's user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the device of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the device was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular phone;

10. records of or information about Internet Protocol addresses used by the device  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in digital devices and cellular devices, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular telephones and cellular devices seized;

vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the digital or cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, memory cards, and security devices.

## II.    **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-12

### Person to be Searched

**ROBERT HOGAN** ("HOGAN" or "TARGET PERSON 2") HOGAN is described as a

white male with brown eyes and blonde hair. HOGAN is 5 foot 9 inches tall and weighs 174 pounds.

HOGAN has a registered address of 26 Becker Avenue, Johnston, Rhode Island 02919.



## ATTACHMENT B-12

### Particular Things to be Seized (Target Person 2)

a)    Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

b)    Keys for a Chevrolet Truck

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the cellular device/telephone was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

    i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.    Any incoming/outgoing text messages relating to the above criminal violations;

    iv.    Telephone subscriber information;

    v.    The telephone numbers stored in the cellular telephone and/or PDA;

    vi.    Records relating to the use, possession, and control of any cellular devices/ telephones seized;

    vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.    <u>SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE</u>

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.      The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.      The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a cellular device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular

device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.      The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.      After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-13

### Premises to be Searched

**ROBERT HOGAN's** residence at 26 Becker Street, Johnston, Rhode Island ("TARGET PREMISES 9"). Described as a 1288 square foot single family home with 3 bedrooms and 1 bathroom. The exterior is a combination of brick and white vinyl siding with white accents. The entirety of the property is fenced in with a chain link fence. There is a walkway from the sidewalk that leads to 4 stairs which lead to the front door which has a glass screen door. To the right of the front door is a black mailbox with the number "26" on the mailbox. There is only one mailbox on the building. In the front yard there is a post with the American Flag hanging. To the right of the building is a large raised wooden deck, which leads to a glass sliding door that enters into the residence. At the rear of the residence is a "pop up" shed and a back door to the residence.





## ATTACHMENT B-13

### Particular Things to be Seized   (TARGET PREMISES 9)

a)      Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

b)      Keys for a Chevrolet Truck

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1.  evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5.  evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6.  evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7.  evidence of programs (and associated data) that are designed to eliminate data from the device;

8.  evidence of the times the cellular device/telephone was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

    i. Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii. Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii. Any incoming/outgoing text messages relating to the above criminal violations;

    iv. Telephone subscriber information;

    v. The telephone numbers stored in the cellular telephone and/or PDA;

    vi. Records relating to the use, possession, and control of any cellular devices/ telephones seized;

    vii. Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.  SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a cellular device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular

device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.     The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.     After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

## ATTACHMENT A-14

### Vehicle to be Searched

**ROBERT HOGAN's** vehicle, a 2019 black Chevy Truck ("TARGET VEHICLE 3") bearing

the Rhode Island registration: 1FK712, VIN: 2GCVKPEC9K1171977. The TARGET VEHICLE 3

is registered to ROBERT HOGAN, with an address of 26 Becker Street, Johnston, Rhode Island.

The TARGET VEHICLE 3 also has a truck cap with the writing, "TASCO SECURITY."



**ATTACHMENT B-14**

**Particular Things to be Seized (TARGET VEHICLE 3)**

The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g)(1) possession of firearms by a person convicted of a crime punishable by more than one year imprisonment and Title 21 United States Code, Sections 841(a)(1), distribution of controlled substances (herein referred to as the SPECIFIED FEDERAL OFFENSES), namely:

    a)    Any firearm

    b)    Ammunition

    c)    Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the cellular device/telephone was used;

9.  passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

     i.    Telephone numbers of incoming/outgoing calls stored in the call registry;

     ii.    Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

     iii.    Any incoming/outgoing text messages relating to the above criminal violations;

     iv.    Telephone subscriber information;

     v.    The telephone numbers stored in the cellular telephone and/or PDA;

     vi.    Records relating to the use, possession, and control of any cellular devices/ telephones seized;

     vii.    Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.    <u>SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE</u>

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.     If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a cellular  device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.      The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.      After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

d)

**ATTACHMENT A-15**

Premises to be Searched

**CARLOS RODRIGUEZ's** residence at 276/294/298 Pawtucket Avenue, Apartment 6, Pawtucket, Rhode Island ("TARGET PREMISES 10"). Described as a large multi-family apartment complex. 298/294 Pawtucket Avenue Pawtucket, Rhode Island is described as an apartment/ store front commercial style building. Murphy's Liquor Store is located in the front of the building on Pawtucket Avenue. The property is listed having 2,922 square feet of total apartment square footage and a total 3,132 square feet on the first floor. On the front of the building to the right of the door the number "298" is clearly affixed to the building. On the right side of the building is the driveway which leads to a lot with approximately six (6) parking spot. The rear of 298/294 Pawtucket Avenue has two (2) staircases one (1) that lead up to an open porch and another that leads up to a wooden deck. The open porch goes the length of the building, attaching to the wooden deck at the end. In inquiry of the property through the City of Pawtucket's public tax assessor database, list R&L Reality LLC, located at 298/294 Pawtucket Avenue Pawtucket, Rhode Island as the property owner of 298/294 Pawtucket Avenue Pawtucket, Rhode Island. Further checks of the public database showed that 276 Pawtucket Avenue Pawtucket, Rhode Island is also owned by R&L Reality LLC. 276 Pawtucket Avenue Pawtucket, Rhode Island is described as an apartment/ store front commercial style building, three (3) stories high, with approximately 3, 488 square feet of living space. The front of 276 Pawtucket Avenue is also addressed as Murphy's Liquor Store. The rear of 276 Pawtucket Avenue has a wooden deck, which is the same deck that is connected to 298/294 Pawtucket Avenue Pawtucket, Rhode Island.

Entry into The TARGET PREMISES 10 is made by accessing the rear of the building depicted in the third photo and designated with a blue arrow, shown below labeled REAR

ENRTY.  Beyond the entry door depicted is a common hallway.  Apartment 6, the TARGET

PREMISES 10 is located to the righ the entry door and is located on the second floor of the

building in the area depicted below in VIEW ABOVE BUILDING and the area of the

building is designated with an arrow.  TARGET PREMISES 10 is accessed from the door

depicted in the fourth photograph below labeled DOOR.

FRONT



VIEW ABOVE BUILDING



REAR ENRTY



DOOR



## ATTACHMENT B-15

### Particular Things to be Seized (TARGET PREMISES 10)

a)      Any CELLULAR DEVICE/ TELEPHONE which itself or which contains evidence, contraband, fruits, or instrumentalities of the SPECIFIED FEDERAL OFFENSES, and forensic copies thereof.

With respect to any cellular device/telephone containing evidence falling within the scope of the foregoing categories of items to be seized;

1. evidence of who used, owned, or controlled the cellular device/telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved user names and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2. evidence of software that would allow others to control the cellular device/telephone, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3. evidence of the lack of such malicious software;

4. evidence indicating how and when the cellular device/ telephone accessed or used to determine the chronological context of device's access, use, and events relating to the crimes under investigation and to the phone user;

5. evidence indicating the cellular device's/telephone user's knowledge and/or intent as it relates to the crimes under investigation;

6. evidence of the attachment to the cellular device/telephone of other storage devices or similar containers for electronic evidence;

7. evidence of programs (and associated data) that are designed to eliminate data from the device;

8. evidence of the times the cellular device/telephone was used;

9. passwords, encryption keys, and other access devices that may be necessary to access the cellular device/telephone;

10. records of or information about Internet Protocol addresses used by the cellular device/telephone  and

11. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

12. With respect to any and all electronically stored information in the cellular device/s/telephone, in addition to the information described herein, agents may also access, record and seize the following:

    i.      Telephone numbers of incoming/outgoing calls stored in the call registry;

    ii.     Digital, cellular and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    iii.    Any incoming/outgoing text messages relating to the above criminal violations;

    iv.    Telephone subscriber information;

    v.      The telephone numbers stored in the cellular telephone and/or PDA;

    vi.    Records relating to the use, possession, and control of any cellular devices/ telephones seized;

    vii.   Any other electronic information stored in the memory and/or accessed by the active electronic features of the cellular phone/device including but not limited to photographs, videos, e-mail, and voice mail relating to the above SPECIFIED FEDERAL OFFENSES.

As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on the cellular device/telephone and any forensic copies thereof.

## II.    SEARCH PROCEDURE FOR CELLULAR DEVICE/TELEPHONE

In searching cellular devices/telephones (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

    a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.

    b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.      The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.    The search team may use forensic examination and searching tools such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.      If the search team, while searching a cellular device/telephone, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.      If the search determines that a cellular device/telephone does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.      If the search determines that a cellular device/telephon does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.      If the search determines that a cellular device/telephone is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the cellular

device/telephone, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a cellular device/telephone if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the cellular device/telephone or files contained therein is/are encrypted.

h.    After the completion of the search of the cellular devices/telephones, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.